PEOPLE v LEWIS

PEOPLE v MALLORY

Docket Nos. 93111, 94182. Submitted January 14, 1988, at Detroit. Decided May 2, 1988. Leave to appeal applied for in Mallory.

Hughie Lewis and Bobby Mallory were convicted of first-degree murder for the fatal beating and stabbing of O'Dell Cheatham in 1978 following a jury trial in Detroit Recorder's Court, Joseph A. Gillis, J. The Court of Appeals affirmed the convictions, 97 Mich App 359 (1980), but the Supreme Court reversed the convictions and ordered a retrial, 421 Mich 229 (1984). On retrial, defendants were convicted of second-degree murder following a bench trial and sentenced to 59 to 119 years and 60 to 120 years, respectively, in prison, George W. Crockett, III, J. Defendants appealed. The appeals have been consolidated.

The Court of Appeals *held:*

1. The trial court did not err in denying defendants' motion to suppress evidence of their identification during a lineup which was held while they were subjected to an unlawful delay in arraignment. The delay in arraignment had nothing to do with the lineup identification.

2. Minimal references in the retrial to the victim's incapacity at the time of the assault by defendants were harmless and did not violate the Supreme Court's admonishment that evidence of Cheatham's brain cancer should not be admitted at the retrial. The fact that Cheatham had brain cancer was not mentioned, the disputed testimony was introduced by defense counsel, and the trial judge expressly stated that the minimal references to incapacity had no effect on the court's verdict.

3. Any error which may have occurred in the court's admitting into evidence a police officer's testimony as to a statement made by the police dispatcher that he had a report of a felonious assault involving a green Buick and three men was

REFERENCES

Am Jur 2d, Evidence §§ 4, 159 *et seq.,* 436, 493, 590.

Am Jur 2d, Pardon and Parole § 73.

Am Jur 2d, Trial § 1259.

Admissibility in state court proceedings of police reports under official record exception to hearsay rule. 31 ALR4th 913.

harmless. The same facts were shown by other competent evidence.

4. There was sufficient evidence presented at trial to support the convictions of second-degree murder. A rational trier of fact could have found that the element of malice was proven beyond a reasonable doubt.

5. The sentences imposed are not shocking and do not constitute cruel and unusual punishment. The defendants will be eligible for parole well within their life expectancies.

Affirmed.

1. CRIMINAL LAW — EVIDENCE — UNLAWFUL DETENTION.

Not all evidence acquired directly or indirectly from a defendant during a statutorily unlawful detention is necessarily procured by exploiting the detention; evidence obtained by means sufficiently distinguishable to be purged of the taint of unlawful detention is admissible.

2. EVIDENCE — HEARSAY — RADIO REPORTS.

A statement transmitted over a police radio may be admissible to demonstrate the listener's knowledge and motives and the basis of the listener's subsequent actions; a statement offered for such a purpose rather than to prove the truth of the matter it asserts is not hearsay.

3. EVIDENCE — HEARSAY — HARMLESS ERROR.

Admission of hearsay is harmless error where the same facts are shown by other competent evidence.

4. TRIAL — FINDINGS OF FACT.

A judge's failure to find the facts does not require remand where it is manifest that he was aware of the factual issue, that he resolved it and it would not facilitate appellate review to require further explication of the path he followed in reaching the result.

5. CRIMINAL LAW — MALICE — INFERENCES.

A jury can properly infer malice from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm.

6. CRIMINAL LAW — SENTENCING — PAROLE — PROPOSAL B.

Proposal B, which mandates that parole shall not be granted to persons committing certain offenses until the minimum sentence imposed by the court has been served, applies only to offenses committed after its effective date, December 12, 1978 (MCL 791.233; MSA 28.2303).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of the Criminal Division, Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Gerald M. Lorence,* for Hughie V. Lewis.

State Appellate Defender (by *Chari K. Grove*), for Bobby Mallory.

Before: J. H. GILLIS, P.J., and WEAVER and G. S. ALLEN,* JJ.

G. S. ALLEN, J. Upon retrial for the fatal beating and stabbing of O'Dell Cheatham on January 12, 1978, defendants Mallory and Lewis were convicted of the lesser included offense of second-degree murder. A third defendant, Charles Howard, was acquitted. At the first trial, all three defendants were convicted by jury of first-degree felony murder. Those convictions were affirmed by the Court of Appeals,[1] but were reversed and a retrial was ordered by the Supreme Court in *People v Mallory,* 421 Mich 229; 365 NW2d 673 (1984). Sentenced to 60 to 120 and 59 to 119 years in prison respectively, Mallory and Lewis appeal as of right. Their appeals have been consolidated.

### FACTS

On the evening of January 12, 1978, Robert Parker looked out his apartment window and saw

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

[1] *People v Lewis* and *People v Howard,* 97 Mich App 359; 296 NW2d 22 (1980); *People v Mallory,* unpublished opinion per curiam of the Court of Appeals, decided November 26, 1979 (Docket No. 78-2377.)

two men throw O'Dell Cheatham onto the hood of a car and beat him. Parker went to telephone the police. When he returned to the window, the victim was lying on the ground and the two men were jumping on his head. When the police arrived, Parker gave them the descriptions of the two men and described the car as a green Buick with damage to the rear. He described a third man, the driver of the car, only as being dark-complected.

Shortly thereafter, only a few blocks from where the assault occurred, police officers on routine patrol came upon three men standing near a green Buick which was steaming and facing the wrong direction on the road. Defendant Howard stated it was his car and claimed he had been in a hit-and-run accident. When the officers called in for information on a hit-and-run accident, the dispatcher stated no report had been received of a hit-and-run, but a report had come in about a felonious assault by three men in a green Buick. Upon receipt of this report, the officers patted down all three men. Lewis and Mallory were released and went into a nearby house and Howard was arrested. When backup police arrived, the officers obtained consent to enter the house, where they found Lewis and Mallory hiding behind the furnace in the basement and arrested them.

The next morning, January 13, 1978, a "reverse writ" was obtained from a magistrate. A reverse writ was a unique procedure by which Detroit police sought to justify continued detention of an arrestee. A second reverse writ was obtained the following morning, January 14, since a writ was thought to be valid for only one day. At that time, police noticed what might be blood on Mallory's shoes. At about 5:00 P.M., the three defendants were placed in several lineups, at which Robert

Parker identified Mallory and Lewis. Howard was not identified. During the identification proceedings Parker stated the assailants jumped on the victim as he lay on the ground. On the basis of that statement, a police officer took Mallory's shoes, but did so without a search warrant.

Later in the evening of January 14, Howard's sister came to the police station. As one of the officers was accompanying Howard from his cell to the visiting area, the officer commented to Howard that Mallory and Lewis had been identified. Howard responded that if they were identified he was identified because he had been with them the entire evening of January 12. On the previous day, Howard had been advised of his *Miranda*[2] rights by another officer. The three defendants were arraigned on the morning of January 15. At the time of the attack, Cheatham had terminal brain cancer and paralysis of his right arm.

In *Mallory,* the Supreme Court held that all three defendants had been unlawfully detained under invalid "reverse writs" and that certain evidence obtained during the unlawful detention should be excluded, viz.: the shoes seized from Mallory, the results of the blood test on the shoes, and Howard's statement when told the other two defendants had been identified.

### ISSUES

On appeal five issues are raised. Issue i is of first impression and Issue v reflects a split on this Court.

I. Did the trial court err in denying defendants' motion to suppress the lineup identification of defendants? Stated another way, does an unlawful

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

delay in arraignment require suppression of a corporeal lineup held during the period of delay?

II. Did evidence of the victim's physical incapacity elicited on cross-examination deny defendants a fair trial?

III. Did admission of testimony of the arresting officer of a radio call violate defendants' right to confrontation, constitute impermissible hearsay, or evidence that is more prejudicial than probative?

IV. Were the trial court's findings of fact on the elements of the offense, especially the element of intent, inadequate and was the evidence of intent sufficient to support a conviction for murder?

V. Do the sentences of terms of years greater than defendants' life expectancies constitute cruel and unusual punishment or an abuse of discretion that shocks the judicial conscience?

I

Prior to retrial, defendants moved to suppress evidence of the lineup identification by the eyewitness, Robert Parker, on grounds that the unlawful delay in arraignment which occurred during the invalid "reverse writ" procedure was used to marshal evidence against defendants and therefore all evidence procured during the delay must be excluded. Following extensive argument, the trial court denied the motion on grounds that the Supreme Court, although knowing all the facts, ruled that Mallory's shoes, the results of the blood tests performed on the shoes, and evidence of Howard's statements should be excluded upon retrial and did not extend the exclusion to the lineup evidence.

Examination of the printed briefs and record on file with the Supreme Court reveals that, contrary to defendant Lewis' assertion, the question of the propriety of the lineup identification was squarely

presented.[3] Yet, the Supreme Court declined to rule that the lineup identification should be suppressed. Defendants now ask this Court to do what the Supreme Court declined to do. Had the issue not been raised in *Mallory,* there might be merit in defendants' request, but since the question was raised and the requested relief was not granted, this Court declines relief.

Rather than standing on the technicality that suppression of the lineup identification was rejected sub silentio in *Mallory,* we proceed to address the issue on its merits. Prior to *Mallory,* the exclusionary rule was applied only to statements made by a defendant while unlawfully detained. With three justices dissenting, the Court in *Mallory* extended the rule to apply

> whenever a statutorily unlawful detention has been employed as a tool to directly procure any type of evidence from a detainee. See *People v McCoy,* 29 Mich App 589, 591-592; 185 NW2d 588 (1971). Moreover, the exclusionary rule will bar any other evidence *which would not have been discovered but for that direct procurement.*

---

[3]

Additionally, defendant contends that a lineup identification is also a foreseeable consequence of an arrest and subsequent illegal detention, where the identity of the perpetrator is known, and consequently, the show-up conducted after defendant's arrest should have been suppressed. Although it can be argued that the physical appearance cannot be seized by the police, and therefore not subject to the exclusionary rule of *Mapp v Ohio,* one need only look to *People v Kusowski,* 71 Mich App 730 [248 NW2d 668 (1976)], in which a witness' testimony was suppressed where the identification of the witness was learned through illegal procedure. . . . Absent the ability of the prosecution to establish an independent basis of identification other than the lineup identification, the case should be reversed and the defendant discharged. [(Brief of defendant Lewis, pp 6-7). See also, pages 22-23 of the people's brief responding to the issue so raised. Note also that *Kusowski* was reversed by the Supreme Court, 403 Mich 653; 272 NW2d 503 (1978).]

Obviously, not all evidence acquired directly or indirectly from a detainee during a statutorily unlawful detention will be procured by exploiting that detention, e.g., . . . or any evidence obtained by means sufficiently distinguishable to be purged of the taint of the unlawful detention. The exclusionary rule *will not bar the admission at trial of evidence which has been acquired absent exploitation of a statutorily unlawful detention.* [Emphasis supplied. *Mallory,* pp 240-241.]

Application of the above rule to the facts in the instant case indicates that, while Parker's identification occurred during the period of an unlawful detention, it was not evidence "which would not have been discovered but for that direct procurement." Stated another way, it was evidence which otherwise would have been acquired.

The Supreme Court meticulously explained that, had defendants been promptly arraigned, bail might have been set prior to Cheatham's death on the afternoon of Friday, January 13.[4] In that event, neither Mallory's shoes nor the blood thereon would have been discovered. Similarly, Howard's statement that he had been with Mallory and Lewis the evening of the assault would not have been made. Corporeal identification is not causally linked to the time of arraignment. Frequently, identification does not occur until several days after an arrest, particularly where the detention occurs, as here, during or near a weekend. Parker's identity and address were known to the police prior to the arrest and thus the delay in arraignment, while arguably causing Howard's statement, had nothing to do with Parker's identification. Parker would have identified the defendants despite the delay. Simply stated, the period

[4] *Mallory, supra,* p 242, n 7.

of unlawful detention was not "employed as a tool to directly procure" the identification. Identification occurred within forty-two hours of an arrest for probable cause.[5] This is well within the time period permitted for lineup identification.

Further, since the rationale behind the exclusionary rule is to deter police misconduct, we find no purpose is served by excluding testimony which would have been admitted even if the police had not unlawfully detained the defendants. While the shoes, the blood stains, and Howard's statement might not have been brought to light *but for* the unlawful detention of all defendants, Parker's identification would have occurred anyway. Consequently, the lineup identification of defendants is not evidence which under *Mallory* "would not have been discovered but for that direct procurement." It is not Parker's statements at the lineup that are at issue, but the information derived from those statements, the identification of Mallory and Lewis. Because there was sufficient information available to the police concerning the eyewitness, the identification of Mallory and Lewis was inevitable.

Finally, we reject the argument that the trial court should have followed the reasoning of *United States v Crews*, 445 US 463; 100 S Ct 1244; 63 L Ed 2d 537 (1980), and held an evidentiary hearing. *Crews* is distinguishable since it involved an arrest without a warrant and without probable cause. The Supreme Court in *Mallory*, for purposes of its analysis, assumed the police had probable cause to arrest and that the arrests were effectuated in a lawful manner. *Mallory, supra*, p 240 n 6.

For the foregoing reasons we hold that the trial

---

[5] The arrests were made at approximately 11:00 P.M., Thursday, January 12. The lineup occurred about 5:00 P.M., Saturday, January 14.

court did not err in denying the motion to suppress the lineup identification.

II

At defendants' first trial, graphic testimony that the victim had terminal brain cancer, resulting in the loss of use of his right arm, was admitted into evidence over the objections of defendants. In *Mallory*, the Supreme Court held the testimony had no logical or legal relevance to prosecution for first-degree felony murder and admonished "this evidence should not be admitted at any retrial involving any of the defendants." *Id.*, p 251. However, references to Cheatham's incapacity crept in at the second trial. During defense counsel's cross-examination of Cheatham's mother, the following exchange occurred:

> *Q.* You didn't see him get dressed that day, did you?
> *A.* He couldn't dress by hisself [sic].
> *Q.* Listen to my question. Did you watch him dress?
> *A.* Yes, I saw him got [sic] dressed.
>
> *       *       *
>
> *Q.* Now which pocket did she put it in, if you know?
> *A.* I think, to my recall, I think it was the right pocket.
> *Q.* Right front pants pocket?
> *A.* Yes, I think that's the one she put it in.
> *Q.* Are you certain of that?
> *A.* I'm not—I think she put it in his right pants pocket, because he couldn't only [sic] use but one hand.

During cross-examination of Margaret Ruff, Cheatham's girlfriend, defense counsel inquired when

Cheatham had been at her house and the witness responded it was in the evening and that he had stayed about an hour. The court interjected and the following exchange occurred:

> *The Court*: Where did you live then, ma'am?
> *A.* On McDouggal.
> *The Court*: And how far was that from where Mr. Cheatham lived at the time, do you know?
> *A.* Not exactly, but I think it's about eight blocks.
> *The Court*: I gather that Mr. Cheatham was somewhat incapacitated?
> *A.* Yeah.
> *The Court*: What was wrong?
> *A.* Well, he had lost, you know, not complete control.

Defense counsel objected to the last response on grounds that it touched upon prejudicial information excluded by the Supreme Court.

Citing authority that improper information obtained in a bench trial may deny a defendant a fair trial, defendants argue that the very evidence which was excluded by the Supreme Court as unduly prejudicial was again introduced into evidence and, if not that, at least that the trial court was necessarily prejudiced by testimony that the victim was physically incapacitated. We disagree on several grounds. First, the Supreme Court's admonition pertained to testimony that the victim had terminal brain cancer. The witness' responses made no mention of brain cancer. Second, the disputed testimony was introduced by defense counsel, not the prosecution. See *People v Brocato*, 17 Mich App 277, 305; 169 NW2d 483 (1969). Third, the trial judge expressly stated that the minimal references to incapacity had no impact on the court's verdict. In view of the Supreme Court's

declination to find the "graphic testimony" from the first trial grounds for reversal, we conclude that the minimal references in the second trial concerning incapacity are at most harmless, particularly because they were made in a bench trial.

III

Defendants objected to the testimony of police officer Anthony Quarles concerning the radio report given him when he called in for information about a hit-and-run accident. The officer stated he called in after he and officers with him on routine patrol came upon a green Buick facing the wrong direction and was told by the driver that the Buick had been struck by a hit-and-run driver. Officer Quarles explained that, before he saw the Buick, information about a felonious assault in the neighborhood had been broadcast over the police radio but that he had no reason to believe that the Buick and its three passengers were connected with the assault. Over defendants' objection, Quarles stated that when he made the radio call the dispatcher told him there was no report of a hit-and-run but that he did have a felonious assault report involving a green Buick and three men.

Defendants argue that the dispatcher's statement constitutes impermissible hearsay, violates defendants' right to confrontation, and is more prejudicial than probative. In support of this claim defendants cite *People v Harris,* 41 Mich App 389; 200 NW2d 349 (1972); *People v Wilkins,* 408 Mich 69; 288 NW2d 583 (1980); and *People v Eady,* 409 Mich 356; 294 NW2d 202 (1980). The prosecutor argues that the evidence was offered to show why the officers arrested the three men involved.

Admission of evidence of the radio report does

not require reversal. *Harris* and *Wilkins* are both distinguishable since each involved reports received by the police from an unknown eyewitness who was never produced in court. In the instant case Robert Parker, the eyewitness of the assault and the person making the report to the police, testified and was cross-examined.

Hearsay is an extrajudicial statement offered to prove the truth of the matter asserted therein. MRE 801(c). The dispatcher's statement was offered to explain why the police did what they did after receiving the report. In *People v Pawelczak,* 125 Mich App 231, 234-235; 336 NW2d 453 (1983), our Court stated:

> [I]n some instances evidence of statements transmitted over the radio may be properly admitted for purposes other than to show the truth of the matter asserted, such as to show the listeners' knowledge or motives if relevant to an issue in the case.
>
> * * *
>
> The evidence at issue here was offered to show the motives of the police officers for pursuing the stolen vehicle and *for arresting defendant rather than to prove the truth of the matter asserted.* The circumstances of the arrest were relevant to prove defendant's identity as the perpetrator of the crime. [Emphasis supplied.]

In *Eady, supra,* a police dispatcher's statement that a person called in and reported that someone was screaming and a horn was blowing was offered in evidence to prove that the complaining witness was screaming and honking the horn before the police arrived. Because the statement was offered to prove the truth of the matter asserted, the Court held it was impermissible hearsay. That is not the situation in the instant case.

Finally, on this issue, we note that even where evidence is hearsay its admission is harmless error where the same facts are shown by other competent evidence. *People v Slaton,* 135 Mich App 328, 338; 354 NW2d 326 (1984), lv den 422 Mich 854 (1985). In the instant case the eyewitness testified at length about his description of the assailants and the car involved in the assault. Ergo, even if the radio statement was hearsay, the error is harmless.

IV

Defendants argue that the trial court found them guilty without *specifically* finding any of the legal elements of the offense. MCR 2.517 provides that "[b]rief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without overelaboration of detail or particularization of facts." The elements of second-degree murder are: (1) that a death occurred, (2) that it was caused by the defendant, (3) that the killing was done with malice, and (4) without justification or excuse. *People v Smith,* 148 Mich App 16, 21; 384 NW2d 68 (1985). As the primary issue at trial was identity, the trial court's findings concentrated on that element without particularization of the other elements of second-degree murder. The other elements are established by the testimony. The body of O'Dell Cheatham was identified by relatives on January 14, 1978. Cheatham died of blunt force injuries to his head and stab wounds to the chest. Mallory and Lewis were identified by the eyewitness as the two men who beat Cheatham. Further, it is clear that the judge was aware of these factual issues and resolved them. Our Supreme Court has ruled: "A judge's failure to find the facts does not require remand where it is manifest that

he was aware of the factual issue, that he resolved it and it would not facilitate appellate review to require further explication of the path he followed in reaching the result . . . ." *People v Jackson,* 390 Mich 621, 627, n 3; 212 NW2d 918 (1973).

When the trial court rendered its verdict finding Mallory and Lewis guilty of second-degree murder and defendant Howard not guilty, it did not make a specific factual finding of malice. However, the record reveals that the trial court was aware of and properly applied the relevant law. Just before oral argument, the trial court entertained the defendants' motion to dismiss, reviewed the elements of first-degree felony murder and second-degree murder and dismissed the charge of murder in the first degree. In arriving at this decision the court discussed and applied the mental element of murder, malice. The court stated in part:

> Murder is defined as the killing of a human being without justification or excuse and requires a certain mental element, an intention to kill, an intention to do great bodily harm, or the creation of a very high risk of death or great bodily harm if knowledge that death or great bodily harm would be the probable result.
>
> The intention is a state of mind and can be demonstrated by what a person says or does. It can also be demonstrated, or a lawful, legitimate inference of intention to kill can be established where there is evidence of the use of a dangerous weapon.
>
> \* \* \*
>
> Prosecution's exhibit one, the medical examiner's protocol, among other things, evidences the use of a dangerous weapon, a knife.

Although this decision is not part of the findings of fact, it demonstrates the court's awareness of the

law and its application to these defendants. Malice is the mental state required for murder and consists of the intent to kill, to cause great bodily harm, or to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *People v Woods,* 416 Mich 581; 331 NW2d 707 (1982); *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980). As a matter of law, malice cannot be implied from a sudden, unprovoked and unjustifiable killing, because the question of whether malice existed must always be submitted to the trier of fact. *Woods, supra,* p 597. *Aaron, supra,* p 733. However, a jury can properly infer malice from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm. *Id.,* p 729. The necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing. *Woods, supra,* p 597.

Upon considering the court's statement in ruling on defendants' motion to dismiss, the eyewitness' testimony of the severe beating inflicted, and the medical evidence of the stab wounds received, we find sufficient evidence was presented at trial to support the convictions of second-degree murder. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the element of malice was proven beyond a reasonable doubt. *People v Petrella,* 424 Mich 221, 269-270; 380 NW2d 11 (1985).

v

Do the sentences of 60 to 120 years (Mallory) and 59 to 119 years (Lewis) constitute cruel and unusual punishment or an abuse of discretion which shocks the judicial conscience? Second-de-

gree murder is punishable "by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same." MCL 750.317; MSA 28.549. Exercising the discretion given under the statute, the trial judge chose not to sentence defendants to life imprisonment but instead to an indeterminate term of years.

As defendants point out, had the court imposed sentences "for life," defendants would be eligible for possible parole within ten years, yet despite this, defendants were given sentences "far worse than life . . . and tantamount to non-parolable natural life in prison." Defendants err. Only if the sentences imposed would fall within Proposal B (MCL 791.233; MSA 28.2303) would defendants not be eligible for parole until they had served the minimum sixty-year and fifty-nine year terms. Proposal B became effective December 12, 1978. It applies to described offenses committed *after* that date. Since the fatal beating and stabbing of O'Dell Cheatham occurred on January 12, 1978, Proposal B is not controlling.

Therefore, the sentences meted out by the court on retrial are not tantamount to the life sentences for first-degree murder imposed at the first trial. Contrary to their claims, Mallory and Lewis are eligible for good time and disciplinary credits. Assuming they commit no offenses during incarceration and earn the maximum credits allowable, Mallory would be eligible for parole in twenty-one years and two months and Lewis in twenty years and eleven months.

Lengthy sentences have been upheld where the crimes committed are particularly shocking. For example, in *People v Brown,* 150 Mich App 168, 172; 388 NW2d 249 (1986), a defendant's sentence of sixty-six to ninety-nine years for committing criminal sexual conduct in the first degree involv-

ing a seventy-four-year-old woman was found not to shock the judicial conscience. In the instant case, an even more vicious assault was made on a young man—an 18-year-old, 5'6" lad weighing 113 pounds who suffered from terminal brain cancer and had lost the use of his right arm. At sentencing, the court noted these facts and indicated to Mallory that the killing was vicious in the extreme. The court also noted that Lewis was at least 39 years old, 6'3" in height and weighed 213 pounds.

Given the circumstances of this case and the fact that defendants will be eligible for parole well within their life expectancies, we do not find the sentences "shocking" or that they constitute cruel and unusual punishment.

Affirmed.