265 N.J. Super. 296 (1993)
626 A.2d 1105
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STANLEY LEE TUCKER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 1993.
Decided June 11, 1993.
*301 Before Judges MICHELS, BILDER and BAIME.
Claudia Van Wyk, Assistant Deputy Public Defender, argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; Ms. Van Wyk, of counsel and on the brief).
Larry R. Etzweiler, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Mr. Etzweiler, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Tried by a jury, defendant was found guilty of murder (N.J.S.A. 2C:11-3a), burglary (N.J.S.A. 2C:18-2a), theft (N.J.S.A. 2C:20-3a) and possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4d). At sentencing, the trial court merged the weapons count into the murder conviction and imposed a life term with a 30 year period of parole ineligibility. On the burglary conviction, *302 defendant was sentenced to a consecutive term of five years, one-half of which to be served without parole. A concurrent five year sentence was imposed on the theft conviction.
On appeal, defendant argues that (1) his confession was improperly admitted, (2) the trial court incorrectly refused to instruct the jury on the lesser included offenses of aggravated manslaughter and reckless manslaughter, (3) the trial court erred by excluding expert testimony concerning mental retardation at the remand hearing on the question of ineffective assistance of counsel, and (4) the sentences were manifestly excessive and unduly punitive. We find no merit in these contentions and affirm defendant's convictions and the sentences imposed.

I.
On November 23, 1987, Patricia Warner was strangled, asphyxiated and stabbed. It is undisputed that defendant killed the victim and later discarded her body in a creek. Although defendant challenges the Law Division's decision admitting his confession, other evidence presented at trial clearly and overwhelmingly established his guilt. Among other things, these proofs consisted of the detailed account of an eyewitness, substantial physical evidence and defendant's own trial testimony. Without overstatement, it can fairly be said that the trial record reeks of defendant's guilt.
In 1987, Patricia Warner was twenty-five years old and employed as a secretary. She resided in the second floor apartment of a two-family home owned by her parents. The house had been placed on the market for sale because the decedent was planning to relocate. At approximately 4:00 p.m. on November 23, 1987, the decedent's mother and brother attempted to visit the apartment in order to drop off some food. Although the decedent came to the door, the two were not permitted into the apartment. Upon returning with the decedent's father some four hours later to perform carpentry work on the first floor apartment, Mrs. Warner heard someone "knocking" upon the decedent's door. Hearing no *303 response, Mrs. Warner went upstairs and unsuccessfully attempted to gain entry into the apartment. She then left the building and from the sidewalk observed two men walking away with a radio. Mrs. Warner returned to the decedent's apartment where she saw an interior light suddenly dim.
On the next day, Mr. and Mrs. Warner met their real estate broker at the decedent's apartment. Using a key, the three entered the apartment where they found blood on the wall and inside the bathtub. The police were immediately summoned. Upon responding, the police discovered blood on the walls of the foyer and stairway. A "puddle" of blood was found in the bathtub. The police also noticed what appeared to be the broken blade of a steak knife on the floor of the bathroom. In addition, the bedroom had been "ransacked" and a television had been taken from the living room. By the entry to the kitchen, the police found a pail containing a "pinkish liquid."
Three days later, on November 27, 1987, the decedent's automobile was located on a public street several blocks from her apartment. A local resident told the police that she had recently seen the defendant, who she knew as her son's barber, standing next to the car with the door open. She later observed defendant walking toward the railroad tracks accompanied by another male who was having difficulty standing. Further investigation revealed that defendant lived on the same street that the automobile was found.
Defendant was arrested and transported to police headquarters where he was advised of his constitutional rights and questioned. Initially, defendant admitted that he knew the decedent, but denied burglarizing her apartment. He claimed that the decedent's boyfriend, Erk Drury, had borrowed her car and that he briefly accompanied Drury on a ride. Later that evening, defendant told the police that he had accompanied Drury to the decedent's apartment to borrow her car. He claimed that she refused and an argument developed between Drury and the decedent. According to defendant, he left and went to his aunt's *304 house, where Drury, driving the decedent's automobile, subsequently picked him up.
Upon searching defendant's apartment, the police discovered a rusty knife with a wooden handle, two cable boxes, a television and bloodstained clothing. When confronted with this information, defendant claimed that he had purchased one of the cable boxes "on the street", but owned them both, and that he had cut his finger in a fall. When the officer expressed skepticism about the source of blood on his clothes, defendant recounted that the front passenger seat of the decedent's car was "all wet and bloody," thus soiling his clothing. However, defendant could not explain why the bloodstains appeared on the front of his trousers. At this point, the interrogation terminated. Although defendant was advised that he would be charged with burglary and robbery, he agreed to speak to the officers the following day. Defendant remained in jail that night.
At 2:30 p.m. the next day, defendant was again advised of his constitutional rights and questioned. Defendant explained that he and Drury had returned to the decedent's apartment after borrowing her automobile. According to defendant, Drury met with the decedent alone. After a brief period, defendant joined them. On his way up to the second floor apartment, defendant asserted that he noticed blood on the wall and that Drury appeared to be perspiring and "out of breath." Defendant further related that he saw the decedent lying in the bathtub. At this point, defendant claimed that he mistakenly cut his finger with a pocket knife he had been carrying and soaked it in a bucket of water. He recalled helping Drury remove the decedent's body from the apartment and place it in the front passenger seat of her automobile. Drury allegedly drove off with the decedent's body, leaving defendant behind.
Defendant was then permitted to speak to his cousin, who was a police officer. After a brief conference, defendant agreed to lead the police to the decedent's body. Accompanied by the officers, defendant provided directions to a bridge in Hopewell Township. *305 From the automobile, defendant told the police where they could find the decedent's body. Pursuant to defendant's detailed instructions, the police recovered the body in the creek below the bridge. The police discovered a "red cloth" knotted around the decedent's neck. Later that night, defendant gave the police a formal statement in which he essentially repeated what he had told them earlier in the day. The interview was eventually terminated because of the late hour, and defendant agreed to be questioned on the following day.
At noon, on November 29, 1987, defendant was transported from the holding cell, again apprised of his constitutional rights and questioned. Although defendant elaborated on his prior statements, he provided little additional information. The questioning continued throughout the day with numerous interruptions during which he was permitted to eat, smoke and use the bathroom facilities.
Questioning resumed at 9:00 a.m. the next morning. After being advised of his rights, defendant admitted for the first time that he had stolen the television and cable boxes from the decedent's apartment. Later that day, defendant was brought before a municipal court judge for his initial appearance on a complaint charging him with burglary and robbery. Although the proceedings were sound recorded, no transcript was prepared and the tapes were destroyed before this appeal was filed. In the complaint, the word "[r]etained" is circled in the area denoting "defense counsel information." Although this cryptic reference is otherwise unexplained, information presented at a pretrial hearing indicates that defendant had employed David Rhoads, a private attorney, to represent him on unrelated drug charges approximately eight months before the homicide. Although the record is not entirely clear, it is reasonably apparent that defendant apprised the judge at the initial appearance of his prior retention of Mr. Rhoads on the narcotics indictment. In reality, defendant had paid only a fraction of Mr. Rhoads' initial retainer and was later assigned a public defender. As to the present charges, defendant *306 formally applied for an attorney from the Public Defender's Office on December 4 and 5, 1987. The Public Defender subsequently retained Mr. Rhoads to represent defendant on these charges. The point to be stressed is that the record is barren of anything to suggest defendant sought the assistance of a public defender attorney or otherwise expressly invoked his right to counsel at the initial appearance on November 30, 1987. We will return to this point later in our opinion.
On the next day, December 1, 1987, the police returned to defendant's apartment and seized additional items of evidence. Defendant's thirteen year old nephew, Jeffrey Tucker, was present and agreed to accompany the officers to police headquarters for questioning. Jeffrey was interrogated in the presence of his mother. He recounted that at 7:00 p.m. on November 23, 1987, he accompanied defendant to the decedent's apartment. They were invited in and an argument subsequently developed between defendant and the decedent. Defendant grabbed the decedent by the neck, tied her hands behind her back with an extension cord and pushed her into the bedroom. Then, in an enraged state, defendant "stuffed" a pink stocking down the decedent's throat and began strangling her, all in the presence of Jeffrey. After a brief struggle, defendant stabbed the decedent in the back and placed her in the bathtub. According to Jeffrey, defendant rummaged through the victim's purse and obtained what he thought were her car keys. Jeffrey related that the two left the apartment and unsuccessfully attempted to start the car. They returned to the apartment but the front door had locked behind them and defendant, using a screwdriver, was forced to pry it open. Upon gaining access to the apartment, defendant found the right set of keys and, with Jeffrey's assistance, stole the television, a cable box, two radios and a pair of binoculars. After transporting several of these items to defendant's apartment, the two returned, placed the decedent's body in the front seat of the car, drove to the Hopewell bridge, and defendant threw the victim "over the railing" into the canal. They later left the decedent's *307 automobile parked on the defendant's street. Following the interview, Jeffrey was released to his parents' custody.
At approximately 9:00 a.m. the next day, December 2, 1987, defendant was transported from the jail to the special investigations unit of the Mercer County Prosecutor's office. After being advised of his rights and signing various waiver documents, defendant was told by the officers that they had secured Jeffrey's statement. Defendant then confessed that he had "cut [the decedent] and dumped her body into [a creek] in Hopewell." He explained that the decedent had become so angered when he suggested that her boyfriend was a homosexual that she slashed his finger with a kitchen knife. Defendant claimed that he then left the apartment, but returned later with Jeffrey. According to defendant's statement, the decedent attacked him with a knife, but he was able to stab her with a screwdriver, cutting her "somewhere between the face and under the neck." He then tied her hands with an extension cord and "stuffed a piece of clot[h] or a bandanna" in her mouth.
In his statement, defendant recounted that he heard someone knocking at the door shortly after stabbing the victim. After the knocking stopped, defendant ascertained that the decedent was still alive. He then "pulled her by the wrists ... to the bathroom and put her in the tub," before untying her hands. Defendant recounted that he and Jeffrey took a radio from her bedroom and later hid it under his porch. They then returned to the victim's apartment, pried open the door and found the decedent, who was still alive. The two removed the decedent's television, left the apartment, and sold it to someone "on the street." According to defendant, they then returned to the decedent's apartment where they found the victim at the "bottom of the steps." It was at this point that defendant inadvertently cut his finger and placed his hand in a pail of water near the stairway.
At approximately 6:30 a.m., defendant and Jeffrey placed the decedent's body in the front passenger seat of the automobile and drove to the Hopewell bridge. After discarding the body, they *308 returned to defendant's apartment where they changed their clothing. They later parked the decedent's automobile a short distance from defendant's residence.
Defendant's statements were admitted into evidence at trial. So too, Jeffrey Tucker provided detailed testimony, graphically describing the events leading up to the homicide, defendant's strangling and stabbing of the victim, the subsequent theft of her belongings, and the "dumping" of her body into the canal beneath the Hopewell bridge. In addition, Jeffrey testified respecting defendant's plan to "frame" Drury for the killing. Defendant told Jeffrey that if the police should approach him, he was to provide a fabrication which placed upon Drury the responsibility for the murder. At a later date, defendant allegedly instructed Jeffrey to testify falsely at trial.
The State presented the medical examiner who performed the autopsy. She testified that she found a piece of cloth "[v]ery deep ... into the [decedent's] throat covering her airway." She also indicated that the victim's external injuries included "multiple throat slashings[,] ... a deep stab wound to the left side of the neck[,] ... scraping on the right side of her forehead[,] ... abrasions on her midchest[,] ... a superficial stab wound [in the chest area] ... [and] linear ... abrasions on the right wrist." The stab wound on the neck was one to two inches deep, cutting "through the skin, subcutaneous tissues[,] ... the internal jugular vein and a branch of the carotid artery...." According to the medical examiner, a person inflicted with these injuries could survive only twenty or thirty minutes. She concluded that the cause of death was "acute asphyxia due to gagging[] stuffed inside [the decedent's] mouth ... [and] ligature strangulation." The "major contributing cause" of death was said to be "extreme blood loss due to the stab wounds of the neck and multiple throat slashings."
Defendant elected to testify. To some extent, his testimony reflected the description of the killing contained in his formal statement taken on December 2, 1987. According to defendant's *309 testimony, he pushed the victim into her bedroom where he "tied her up" and forced "[s]ome type of silk material" into her mouth. Defendant related that he then "took [the decedent] to the bathroom[,] put her in the tub, ... picked up the knife, ... turned [his] head" and stabbed her one time. Defendant testified that he was "not sure" whether he had stabbed the decedent in the throat, but he knew he had stabbed her somewhere on her body. Defendant claimed that he never intended to kill the victim, and did so only accidentally.
It is against this factual backdrop that we consider defendant's arguments.

II.
We first address defendant's multi-faceted attack upon the trial court's decision admitting his statements into evidence. Defendant asserts that his statements taken on November 27, 28, 29 and 30, 1987 were involuntary because the police failed to "promptly" afford him a probable cause hearing. Although stated in a variety of ways, the principal thrust of defendant's argument is that these statements should have been suppressed as the fruits of an illegal detention. Defendant further claims that his incriminatory statement which followed the initial appearance on the burglary and robbery complaint was taken in violation of his Sixth Amendment right to counsel. It is argued that the right to counsel attached to all proceedings following the initial appearance and that the subsequent police-initiated interrogation was violative of both the federal and state constitutions. We consider these arguments separately.

A. THE COURT'S FINDINGS

Initially, we summarize briefly the trial court's factual findings. It will be recalled from our recitation of the facts that defendant was taken into custody at noon on Friday, November 27, 1987. He gave the police statements on that date, and on Saturday, November 28, 1987. Saturday evening, he showed the *310 police where the body was hidden, and afterwards gave part of a transcribed, formal statement. He continued that formal statement on Sunday, November 29. The next day, Monday morning, November 30, he gave a second transcribed, formal statement, admitting that he stole the victim's television and cable box. Later that day he was brought to the Trenton municipal court for his initial appearance on the complaint for robbery and burglary. He had not then been charged with murder. However, two days later, on Wednesday, December 2, defendant gave a third transcribed, formal statement, admitting that he killed the victim, and he was then arraigned for homicide.
At the pretrial Miranda hearing,[1] the circumstances concerning all of defendant's statements were carefully examined. From the evidence adduced at that hearing, there is no dispute that defendant was first advised of his constitutional rights, and waived them in writing before each and every interrogation. Moreover, he was separately advised of his rights and signed separate waiver forms for each of the three formal statements which he agreed to provide. Upon all occasions, defendant appeared to be sober, alert, attentive, comprehending, and devoid of stress. He was able to read and write, and did read the warnings and waiver aloud to demonstrate his comprehension of them, and had no difficulty in doing so.
When questioned by the police, defendant never requested an attorney, and never indicated that he was represented by counsel. Defendant was afforded all courtesies, including breaks for food, coffee, cigarettes, and use of facilities. Only once did defendant ask to see anyone  namely his cousin  and that request was promptly granted.
Defendant was never threatened, implicitly or explicitly. At all times, only one officer, or rarely, three officers were present for interrogation, or for witnessing his signature, thus avoiding the appearance that the police were attempting to overpower him. *311 Nor was defendant promised any reward for his cooperation. Nevertheless, defendant was always willing, and sometimes eager, to speak with the police.
The trial court found that all of defendant's statements were voluntary. Specifically, the court concluded that "the police acted in a very professional manner[,] ... and ... scrupulously protected the rights of the defendant." The court found "beyond a reasonable doubt" that defendant's statements were voluntary, and were given "after knowing and intelligent waivers." Our review of the hearing transcript supports these conclusions. The findings made "could reasonably have been reached on sufficient credible evidence present in the record." State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).

B. DEFENDANT'S FOURTH AND FIFTH AMENDMENT ARGUMENTS

We reject defendant's argument that his incriminatory statements were the product of an illegal detention. In Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the United States Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. Id. at 125, 95 S.Ct. at 869, 43 L.Ed.2d at 71-72. Specifically, the Court said that a state "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." Ibid.
Sixteen years later, the Supreme Court refined the "promptness" standard in County of Riverside v. McLaughlin, 500 U.S. ___, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). There, the Court held that a judicial determination of probable cause "within 48 hours of arrest" complied with the "promptness requirement" of Gerstein. Id. at ___, 111 S.Ct. at 1670, 114 L.Ed.2d at 63. The Court noted, however, that a probable cause determination within 48 hours of *312 an arrest did not necessarily "pass[] constitutional muster." Ibid. The Court observed:
This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate Gerstein if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities. [Ibid.].
The Court added that the "calculus chang[ed]" where the arrested individual does not receive a probable cause determination within 48 hours. Ibid.
In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. Nor, for that matter, do intervening weekends. A jurisdiction that chooses to offer combined proceedings must do so as soon as is reasonably feasible, but in no event later than 48 hours after arrest. [Ibid.].
It is undisputed that the "48 hour" standard adopted in County of Riverside was violated in this case. Defendant was taken into custody at noon on Friday, November 27, 1987. Although defendant voluntarily accompanied the police, the officers candidly admitted that he was not free to leave. While the record is not entirely clear, it appears that defendant was not afforded a probable cause hearing until some 72 hours after his arrest. One of the reasons for the delay was the intervening weekend, but, as we noted previously, this was not an "emergency or other extraordinary circumstance" sufficient to excuse the failure to provide a prompt probable cause determination by a judicial officer.
Despite this constitutional dereliction, we find no basis to suppress defendant's statements. We note that County of Riverside was decided some four years after the defendant's arrest and *313 detention. While we have no occasion to determine whether or not County of Riverside should be applied retroactively, see Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); Williams v. Bell Telephone Laboratories, Inc., 132 N.J. 109, 121, 623 A.2d 234 (1993); State v. Burstein, 85 N.J. 394, 406, 427 A.2d 525 (1981), we stress that the police did not have the benefit of the Supreme Court's decision and there is nothing in the record to suggest an intentional violation of the defendant's rights or a deliberate attempt to exploit his custodial detention. The question remains whether the defendant's statements should be suppressed because he was arguably not afforded a prompt probable cause determination by a judicial officer.
The United States Supreme Court has held, in the context of its supervisory authority over the federal courts, that confessions made by a defendant during a period of illegal detention are inadmissible. Mallory v. United States, 354 U.S. 449, 455, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479, 1483-84 (1957) (illegal conduct involved police failure to arraign the defendant without unnecessary delay as required by Federal Rules of Criminal Procedure); McNabb v. United States, 318 U.S. 332, 344-45, 63 S.Ct. 608, 615, 87 L.Ed. 819, 826, reh'g denied, 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727 (1943). Nevertheless, our highest Court has consistently declined to adopt this rule. See State v. Barry, 86 N.J. 80, 90-91, 429 A.2d 581, cert. denied, 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981); State v. Jones, 53 N.J. 568, 570, 252 A.2d 37, cert. denied, 395 U.S. 970, 89 S.Ct. 2122, 23 L.Ed.2d 759 (1969); State v. Seefeldt, 51 N.J. 472, 486, 242 A.2d 322 (1968); State v. Taylor, 46 N.J. 316, 328, 217 A.2d 1, cert. denied, 385 U.S. 855, 87 S.Ct. 103, 17 L.Ed.2d 83 (1966); State v. Johnson, 43 N.J. 572, 592-93, 206 A.2d 737 (1965), aff'd, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, reh'g denied, 385 U.S. 890, 87 S.Ct. 12, 17 L.Ed.2d 121 (1966); State v. Jackson, 43 N.J. 148, 167, 203 A.2d 1 (1964) (until there is a "definitive Supreme Court ruling that McNabb-Mallory has attained constitutional dimensions ..." current State procedures will be maintained), cert. denied sub nom., Ravenell v. New *314 Jersey, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965). Our courts treat a delay in bringing a defendant before a judge as a factor in determining the voluntariness of a confession made during the period of detention. State v. Barry, 86 N.J. at 91, 429 A.2d 581; State v. Seefeldt, 51 N.J. at 486, 242 A.2d 322; State v. Jackson, 43 N.J. at 167, 203 A.2d 1; State v. Reyes, 237 N.J. Super. 250, 261, 567 A.2d 287 (App.Div. 1989). The delay does not in itself demand exclusion of an otherwise voluntary confession. State v. Barry, 86 N.J. at 91, 429 A.2d 581; State v. Reyes, 237 N.J. Super. at 261, 567 A.2d 287.
Voluntariness equates to a free and unconstrained choice. Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057 (1961). A confession tainted by coercion, either physical or psychological, which overbears the suspect's will or critically impairs his capacity for self-determination, is involuntary and violative of due process. Id. at 602, 81 S.Ct. at 1879, 6 L.Ed.2d at 1057-58; see also State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978). In determining voluntariness, we consider the totality of the circumstances with particular attention to the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973); State v. Miller, 76 N.J. at 402, 388 A.2d 218.
In the context of Fourth Amendment values, our courts generally focus upon whether the confession "resulted from an exploitation of an illegal arrest," or instead was the "product of the defendant's free will...." State v. Barry, 86 N.J. at 87, 429 A.2d 581; see also Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In the setting of an illegal arrest, the emphasis is upon "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." State v. Barry, 86 N.J. at 87, 429 A.2d 581.
*315 Measured against these standards, we are thoroughly convinced that the delay in affording defendant a probable cause determination did not taint his confessions. As we noted previously, the trial court found that all of defendant's statements were voluntary and the product of his free will. In terms of the Fifth Amendment's voluntariness standard, it is abundantly plain that the failure to provide a probable cause determination had no impact on defendant's state of mind.
In the context of the Fourth Amendment, the failure to afford defendant a probable cause hearing before a judicial officer should not per se be the basis for suppression of his incriminatory statements. The probable cause hearing mandated by Gerstein and County of Riverside is not "accompanied by the full panoply of adversary safeguards  counsel, confrontation, cross-examination, and compulsory process for witnesses." Gerstein v. Pugh, 420 U.S. at 119, 95 S.Ct. at 866, 43 L.Ed.2d at 68. Instead, the Court has emphasized that "[t]he sole issue is whether there is probable cause for detaining the arrested person pending further proceedings[,]" and that can be "determined reliably without an adversary hearing" on "hearsay and written testimony."[2]Id. at 120, 95 S.Ct. at 866, 43 L.Ed.2d at 69. Within this analytical framework, we observe that defendant would have remained in lawful detention had a probable cause hearing been conducted promptly. The circumstances known to the police were clearly sufficient to establish probable cause for defendant's continued detention. Defendant cannot fairly argue that he would have been released had the question of probable cause been decided by a judicial officer within 48 hours of his arrest. While we are mindful of the importance of the constitutional requirements adopted by the Supreme Court in Gerstein and County of Riverside, we are convinced that suppression of defendant's voluntary confessions *316 would be a draconian remedy under the circumstances of this case. See United States v. Adekunle, 980 F.2d 985, 989 (5th Cir.1992) (defendant's Fourth Amendment claim was rejected out-of-hand because the delay in bringing him before a magistrate was justified), cert. denied, ___ U.S. ___, 113 S.Ct. 2380, 124 L.Ed.2d 284 (1993); United States v. Perez-Bustamante, 963 F.2d 48, 53 (5th Cir.) (under totality of the circumstances test, the delay prior to defendant's confession did not render it inadmissible), cert. denied, ___ U.S. ___, 113 S.Ct. 663, 121 L.Ed.2d 588 (1992); State v. Harris, 174 Wis.2d 367, 376, 497 N.W.2d 742, 746 (1993) (while noting the Fourth Amendment claim, the court found that defendant's lawful detention on other charges rendered the period between his arrest on new charges and an initial appearance reasonable). Instead, the requirement of a prompt probable cause hearing should be anchored to the reason for its existence, i.e., to prevent unlawful detention. Here, defendant was detained lawfully and his voluntary statements made during that detention were properly admitted.

C. DEFENDANT'S SIXTH AMENDMENT ARGUMENTS

We next consider defendant's argument that the police-initiated interrogation which followed his initial appearance on the complaint charging him with burglary and robbery violated his Sixth Amendment right to counsel. We also address defendant's contention that the interrogation infringed upon his right to an attorney under article 1, paragraph 10 of the New Jersey Constitution.
We commence our analysis by distinguishing between the rights accorded by the Fifth and Sixth Amendments. The Fifth Amendment commands that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend V; Miranda v. Arizona, 384 U.S. at 442, 86 S.Ct. at 1611, 16 L.Ed.2d at 705; State v. McCloskey, 90 N.J. 18, 24, 446 A.2d 1201 (1982). The privilege against self-incrimination encompasses the right to remain silent. Johnson v. New Jersey, 384 U.S. 719, *317 729-30, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882, 890, reh'g denied, 385 U.S. 890, 87 S.Ct. 12, 17 L.Ed.2d 121 (1966); State v. McCloskey, 90 N.J. at 25, 446 A.2d 1201. Because of the "potentiality for compulsion" inherent in custodial interrogations, a suspect must be warned of his right to refuse to give a statement to the police. Miranda v. Arizona, 384 U.S. at 457, 86 S.Ct. at 1618, 16 L.Ed.2d at 713. The constitutional design is to dispel the psychological as well as physical compulsion which attend police questioning of a suspect whose liberty has been restrained. Id. at 458, 86 S.Ct. at 1619, 16 L.Ed.2d at 714. As such, the privilege is applicable during custodial interrogations and exists regardless of the number of crimes under investigation or whether those offenses have resulted in formal charges. Arizona v. Roberson, 486 U.S. 675, 682-85, 108 S.Ct. 2093, 2098-2100, 100 L.Ed.2d 704, 714-16 (1988). Although the New Jersey Constitution contains no similar counterpart, the privilege has long been recognized as a common law principle and has been incorporated into our evidentiary rules. See State v. Hartley, 103 N.J. 252, 260, 511 A.2d 80 (1986); In re Martin, 90 N.J. 295, 331, 447 A.2d 1290 (1982); Evid.R. 23, 24 and 25.
The Fifth Amendment and New Jersey's common law encompassing the privilege against self-incrimination do not expressly provide for the right to counsel. Instead, it is a preventive measure which protects an accused from self-incrimination. In Miranda v. Arizona, 384 U.S. at 466, 86 S.Ct. at 1623, 16 L.Ed.2d at 719, the Supreme Court required that a suspect in custody must be advised of his right to an attorney. The correlative right to counsel was said to be necessary "to make the process of police interrogation conform to the dictates of the [Fifth Amendment] privilege." Ibid. The right to the presence of an attorney in this context is to "insure that statements made in the government-established atmosphere [of coercion] are not the product of compulsion." Ibid.
Once a suspect in custody invokes his Fifth Amendment privilege, the police must "scrupulously" honor that assertion. See *318 Michigan v. Mosley, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975). Our Supreme Court has held that "before an accused's previously-asserted right to remain silent may be deemed to have been `scrupulously honored,' law-enforcement authorities must, at a minimum, readminister the Miranda warnings." State v. Hartley, 103 N.J. at 256, 511 A.2d 80. The Court said that "[u]nless the police follow this `bright-line,' inflexible, minimum requirement," the defendant's statement must be suppressed. Id. at 267, 511 A.2d 80.
The assertion of a suspect's correlative right to an attorney while being questioned in police custody has also been carefully guarded. In Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386, reh'g denied, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), the United States Supreme Court held that once a defendant has asserted the Fifth Amendment right to counsel, police may not initiate questioning in the absence of an attorney. The Court referred to Miranda's "rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease." Id. 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386 (quoting Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197, 208-09, reh'g denied, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979)). The Court said, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. 451 U.S. at 484, 101 S.Ct. at 1884-85, 68 L.Ed.2d at 386. Further, the Court stressed that "an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges or conversations with the police." Id. at 484-85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386.
*319 The Sixth Amendment right to counsel is broader than that afforded by the Fifth Amendment, but in some ways has taken a parallel course. The Sixth Amendment, like the Fifth, guarantees the right to counsel in pretrial interrogation but serves a different purpose. As we noted, the Fifth Amendment protects an accused from self-incrimination during police questioning, but the Sixth Amendment "remedies the unfairness of that questioning when the defendant is not represented." State v. Sanchez, 129 N.J. 261, 264-65, 609 A.2d 400 (1992).
The purpose of the Sixth Amendment right to counsel is to "enable the defendant to confront the prosecution and to ensure the integrity of the judicial process." Id. at 265, 609 A.2d 400. It is premised on the notion that the "average defendant does not have the professional legal skill to protect himself." Maine v. Moulton, 474 U.S. 159, 169, 106 S.Ct. 477, 483, 88 L.Ed.2d 481, 491 (1985) (quoting Johnson v. Zerbst, 304 U.S. 458, 462-63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461, 1465-66 (1938)). Both state and federal constitutions provide criminal defendants with a right to "Assistance of Counsel" for their defense. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10; see State v. Sanchez, 129 N.J. at 264, 609 A.2d 400; State v. Clausell, 121 N.J. 298, 350, 580 A.2d 221 (1990). This constitutional right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against the defendant. See Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158, 164 (1932). This has been interpreted as the trial and earlier "critical stages" in the criminal justice process where the "results might well settle the accused's fate ..." Maine v. Moulton, 474 U.S. at 170, 106 S.Ct. at 484, 88 L.Ed.2d at 492 (quoting United States v. Wade, 388 U.S. 218, 224, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149, 1156 (1967)); State v. Clausell, 121 N.J. at 351, 580 A.2d 221. This principle, however, applies only to events after initiation of adversarial judicial proceedings. An oft-quoted passage from Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972) elaborates on the principle:

*320 [W]hile members of the Court have differed as to the existence of the right to counsel in the contexts of some of the ... cases, all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings  whether by way of formal charge, preliminary hearing, indictment, information or arraignment. [emphasis in original].
More recently, the Court has stated that an arraignment[3] signals the "initiation of adversary judicial proceedings" and thus attachment of Sixth Amendment rights. Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631, 638 (1986) (quoting United States v. Gouveia, 467 U.S. 180, 187-88, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146, 153-54 (1984)); see also Brewer v. Williams, 430 U.S. 387, 399, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 436, reh'g denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (1977). In Michigan v. Jackson, the Court held that after the arraignment, any government effort "to elicit information from the accused, including interrogation, represent[s] `critical stages' at which the Sixth Amendment applies." 475 U.S. at 629-30, 106 S.Ct. at 1408, 89 L.Ed.2d at 638. The Court reasoned, "[g]iven the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial proceedings `is far from a mere formalism.'" *321 Id. at 631, 106 S.Ct. at 1408, 89 L.Ed.2d at 639 (quoting United States v. Gouveia, 467 U.S. at 189, 104 S.Ct. at 2298, 81 L.Ed.2d at 154). The Court noted, "[i]t is only at that time `that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified," and that the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Ibid. As a result, the "Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a `medium' between him and the State." Id. 475 U.S. at 632, 106 S.Ct. at 1408, 89 L.Ed.2d at 639 (quoting Maine v. Moulton, 474 U.S. at 176, 106 S.Ct. at 487, 88 L.Ed.2d at 496).
Like the Fifth Amendment, the Court said that once the accused has invoked his Sixth Amendment right to counsel after adversary proceedings have commenced, this assertion must be scrupulously honored by law enforcement officers. Relying on Edwards v. Arizona, a Fifth Amendment case, the Court held that "after a suspect's request for counsel, advice of rights and acquiescence in police-initiated questioning could [not] establish a valid waiver." Id. 475 U.S. at 634, 106 S.Ct. at 1410, 89 L.Ed.2d at 641. The Court said, "[j]ust as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." Id. at 635, 106 S.Ct. at 1411, 89 L.Ed.2d at 642. The Court observed:

Edwards is grounded in the understanding that `the assertion of the right to counsel [is] a significant event,' and that `additional safeguards are necessary when the accused asks for counsel.' We conclude that the assertion is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment. We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.

*322 [Ibid., citations omitted].
McNeil v. Wisconsin, 501 U.S. ___, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) followed in the wake of Michigan v. Jackson. There, the defendant was arrested on a charge of armed robbery and brought before a court for his initial appearance[4] where an attorney was assigned to represent him and bail was set. Id. at ___, 111 S.Ct. at 2206, 115 L.Ed.2d at 165. While in custody after the court proceedings, the defendant was advised of his Miranda rights and questioned about an unrelated murder. Ibid. After waiving his rights, the defendant confessed to the homicide and was subsequently tried and convicted of murder. The United States Supreme Court granted certiorari following affirmance of the defendant's conviction. The Court distinguished Michigan v. Jackson and held that the defendant's invocation of his right to counsel at the initial appearance on the robbery complaint did not extend to subsequent police-initiated questioning concerning the unrelated homicide investigation. 501 U.S. at ___, 111 S.Ct. at 2207, 115 L.Ed.2d at 166-67. The Court reasoned that "[t]he Sixth Amendment right ... is offense-specific" and "cannot be invoked once for all future prosecutions." Id. at ___, 111 S.Ct. at 2207, 115 L.Ed.2d at 166; but see Arizona v. Roberson, 486 U.S. at 684-86, 108 S.Ct. at 2099-2100, 100 L.Ed.2d at 715-16 (Fifth Amendment invocation of right to counsel is not offense-specific).
Our description of the present status of the law and the differences between the rights accorded by the Fifth Amendment and those guaranteed by the Sixth Amendment would not be complete without discussing Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) and State v. Sanchez, 129 N.J. at 261, 609 A.2d 400. In Patterson, the defendant gave an incriminating statement to a police officer after being apprised of *323 his Miranda rights following the return of an indictment charging him with murder. 487 U.S. at 287-88, 108 S.Ct. at 2392, 101 L.Ed.2d at 269. A seriously divided Court rejected the defendant's argument that the Sixth Amendment barred the police from initiating post-indictment questioning until he had received the advice of counsel. Id. at 290-91, 108 S.Ct. at 2394, 101 L.Ed.2d at 271. The Court repudiated a distinction between an accused's preindictment Fifth Amendment right to counsel and the Sixth Amendment post-indictment right. Ibid. The issue, according to the Court, was whether the defendant, by waiving the Fifth Amendment right to counsel, had also waived his Sixth Amendment right. Id. at 292, 108 S.Ct. at 2394, 101 L.Ed.2d at 272. The Court held that because the defendant had not asked for a lawyer, the police had not violated his Sixth Amendment rights. Id. at 291, 108 S.Ct. at 2394, 101 L.Ed.2d at 271.
In State v. Sanchez, our Supreme Court departed from this view and held that under our State Constitution, the police are not permitted to initiate questioning of a defendant without the consent of defense counsel once an indictment has been returned. 129 N.J. at 276-77, 609 A.2d 400. The Court reasoned that "[t]he return of an indictment transforms the relationship between the State and the defendant." Id. at 276, 609 A.2d 400. Once the indictment is returned, "the State is committed to prosecute the defendant[,]" and "[f]rom that moment, if not before, the prosecutor and the defendant are adversaries." Ibid. The "spotlight" is then said to be on the accused, and, "[u]nder th[e]se circumstances, the perfunctory recitation of the right to counsel and to remain silent may not provide [him] with sufficient information to make a knowing and intelligent waiver." Ibid. The Court thus held that police-initiated questioning following the return of an indictment is barred even in the absence of a request for counsel by the defendant. Id. at 276-78, 609 A.2d 400.
We have taken pains to trace this constitutional history because it crystallizes the issues presented and the conclusions we reach. Initially, we conclude that the Constitution does not forbid *324 police-initiated questioning of the defendant before the return of an indictment unless the accused, after being advised of his right to counsel, requests the presence of an attorney. While the Sixth Amendment and State constitutional right to counsel attach after the initial appearance has been conducted, we conclude that a defendant may waive his right to an attorney under these provisions as readily as under the Fifth Amendment until the return of the indictment. As long as the defendant has been advised of his right to an attorney and has not, either expressly or impliedly, asked for a lawyer, the police do not violate his right to counsel by questioning him before the return of the indictment.
Stated differently, we do not read State v. Sanchez as barring preindictment police-initiated questioning of a defendant who, after being fairly advised of his rights, does not request an attorney. Our conclusion rests on several bases. We note that our Supreme Court had the benefit of Michigan v. Jackson when it rendered its opinion in Sanchez. In its opinion, the Court described in some detail the United States Supreme Court's holding in Jackson. 129 N.J. at 267-68, 609 A.2d 400. Our Supreme Court was thus aware of Jackson's conclusion that the Sixth Amendment right to counsel attached after the arraignment, or our initial appearance. Ibid. The Court nonetheless prohibited police-initiated interrogations without the consent of counsel only after the return of an indictment. Id. at 276-77, 609 A.2d 400. We repeat the Court's admonition that "[t]he return of an indictment transforms the relationship between the State and the defendant," and after that event, "the perfunctory recitation of the right to counsel [is inadequate] ... to provide the defendant with sufficient information to make a knowing and intelligent waiver." Id. at 276, 609 A.2d 400. Had the Court intended to extend the prohibition against police-initiated interrogation of the defendant to the preindictment setting, it would have said so.
Moreover, while the right to counsel is triggered by the equivalent of our initial appearance in Michigan v. Jackson, our experience in New Jersey indicates that the decision of the State to *325 prosecute is not fully solidified until the return of the indictment. Prior to that event, criminal complaints are routinely dismissed and many charges are downgraded. Although the focus of law enforcement efforts shifts at that point from a detectional to an accusatory stage, the State has not yet presented a prima facie case to the grand jury and other options remain open and are often pursued. Once the indictment is returned, the State is committed to prosecute and the relationship between the prosecutor and the defendant becomes fully adversarial. Because of this, we do not think it unreasonable to require a defendant who has been advised of his right to an attorney by the court in the initial appearance[5] and by the police in the course of the custodial *326 interrogation, to request counsel. If such a request is made, all questioning must cease. But if the defendant, fully aware of his constitutional rights, chooses to waive them and respond to police questioning, we discern no constitutional violation.
In reaching this conclusion, we recognize the danger of self-representation. However, neither our Constitution nor its federal counterpart compels a defendant to seek the services of a lawyer. Instead, they provide no more than that the accused has the right to the assistance of an attorney. Once having been advised of his right to counsel, a defendant may nevertheless waive it and proceed without the benefit of an attorney. If the defendant thereafter reveals his guilt unwittingly, it is no more unfair to use the evidence he discloses than it is to turn against him clues at the scene of the crime which a brighter, better informed or more gifted criminal would have hidden. Cf. State v. McKnight, 52 N.J. 35, 52, 243 A.2d 240 (1968). We acknowledge the exalted status of the right to counsel in the hierarchy of constitutional protections. See State v. Crisafi, 128 N.J. 499, 510-11, 608 A.2d 317, certif. denied, 130 N.J. 398, 614 A.2d 620 (1992). Sundry rights are embedded in our organic law to prove their timeless worth, but they may nevertheless be waived. Thus, while we are solicitous of the right to counsel at the post-indictment and *327 trial stages to the end that a defendant shall not suffer injustice because he is ill-equipped to protect himself, we do not believe that the exact same right should be transferred to the preindictment phase. We, therefore, hold that a defendant, after being advised of his right to counsel at the initial appearance, may forego the assistance of an attorney in subsequent custodial interrogation prior to the return of an indictment.
We thus construe our Supreme Court's holding in Sanchez to be applicable only after an indictment is returned. Hence, a request for counsel must be made, but once asserted, all interrogation must cease. We have carefully examined the record to determine whether defendant invoked his right to an attorney. The transcript clearly establishes that defendant was repeatedly advised of his Miranda rights and effectively waived them. As we noted earlier, the trial court made specific and detailed findings regarding this question, and its conclusions are supported by sufficient credible evidence present in the record. Defense counsel conceded as much in her brief and during oral argument. The trial court's findings in this respect are not challenged on appeal.
Defendant's argument that he invoked his right to counsel is predicated solely on demarcations on the face of the complaint. In the portion dealing with "[d]efense counsel information," the box marked "retained" is circled. We view this scant reference to counsel as too slim a reed upon which to rest defendant's present assertion that he requested the assistance of an attorney. The best that can be said is that after the municipal court judge advised defendant of his right to counsel, Tucker declined the appointment of an attorney on the basis that he had hired a lawyer to represent him some eight months earlier on unrelated drug charges. It is undisputed that defendant made no effort to contact Mr. Rhoads or to procure the services of another lawyer. Only after defendant was formally charged with murder did he seek the assistance of a public defender attorney. Mr. Rhoads' prior representation of defendant on the drug charges clearly did not extend to the subsequent complaints charging *328 Tucker with burglary, robbery and murder. As we noted previously, the right to counsel is "offense-specific." McNeil v. Wisconsin, 501 U.S. at ___, 111 S.Ct. at 2207, 115 L.Ed.2d at 166. Beyond this, Mr. Rhoads' representation of Tucker was aborted long before the complaints were filed.
We thus find no basis in the record for defendant's claim that he invoked his right to an attorney at the initial appearance. Defendant's subsequent statement was voluntarily given after he waived his constitutional rights. The confession was properly admitted.
One further matter should be noted before we leave the subject. As we mentioned at the outset of our opinion, the State's evidence against defendant was overwhelming. Even if defendant's final confession was erroneously admitted, the error was harmless beyond a reasonable doubt. See Arizona v. Fulminante, 499 U.S. ___, ___, 111 S.Ct. 1246, 1257-61, 113 L.Ed.2d 302, 322-26, reh'g denied, ___ U.S. ___, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991).

III.
N.J.S.A. 2C:11-3a(1) and (2) provide that criminal homicide constitutes murder when "[t]he actor purposely causes death or serious bodily injury resulting in death," or when "[t]he actor knowingly causes death or serious bodily injury resulting in death." Applying the definitions of purposeful and knowing conduct contained in N.J.S.A. 2C:2-2b(1) and (2), the crime of murder is established where it was the actor's "conscious object" to cause death or serious bodily injury resulting in death or where he was aware that his conduct would cause death or serious bodily injury resulting in death, or where it was "practically certain" death or serious bodily injury resulting in death would occur.
Manslaughter is criminal homicide committed in a reckless manner or homicide which would otherwise be murder but is "committed in the heat of passion resulting from reasonable provocation." N.J.S.A. 2C:11-4b(1) and (2). Aggravated manslaughter *329 is homicide committed recklessly under circumstances manifesting extreme indifference to human life. N.J.S.A. 2C:11-4a. "Reckless" conduct consists of the actor's "conscious[] disregard[] [of] a substantial and unjustifiable risk." N.J.S.A. 2C:2-2b(3). The risk must be such that "its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." Ibid.
At trial, defense counsel requested that the court charge the jury with all three types of manslaughter as lesser-included offenses of murder. It was counsel's position that aggravated and reckless manslaughter were applicable because the cause of death was partially due to the gag in the decedent's throat. It was asserted that defendant's action in forcing the gag into the victim's mouth, blocking her airway, was reckless conduct which resulted in her death. Passion/provocation was said to derive from testimony regarding the argument between defendant and the victim and her attempts to stab him. The judge denied the defense requests to charge. Defendant now argues that the court erred in failing to instruct the jury on aggravated and reckless manslaughter as lesser-included offenses.[6] We disagree.
It is well-settled that a lesser-included offense must be submitted to the jury when there is a "rational basis" for a conviction of that crime. N.J.S.A. 2C:1-8e; see State v. Mauricio, 117 N.J. 402, 418, 568 A.2d 879 (1990); State v. Moore, 113 N.J. 239, 289, 550 A.2d 117 (1988); State v. Crisantos, 102 N.J. 265, 276, 508 A.2d 167 (1986); State v. Mendez, 252 N.J. Super. 155, 160, 599 A.2d 565 (App.Div. 1991), certif. denied, 127 N.J. 560, 606 A.2d 371 (1992); State v. Bohannan, 206 N.J. Super. 646, 649, 503 A.2d 396 (App.Div. 1986). This is a low threshold. State v. Crisantos, 102 N.J. at 278, 508 A.2d 167; see also State v. Moore, 113 N.J. at 289, 550 A.2d 117. Our Supreme Court has said, "if on the evidence it would not be idle to have the jury decide" whether defendant had committed the lesser-included offense, it is error *330 not to charge that offense. State v. Crisantos, 102 N.J. at 278, 508 A.2d 167 (quoting State v. Sinclair, 49 N.J. 525, 540, 231 A.2d 565 (1967)). As long as the proofs leave room for dispute, the instruction should be given. State v. Sinclair, 49 N.J. at 542, 231 A.2d 565; accord, State v. Crisantos, 102 N.J. at 278, 508 A.2d 167. Putting aside the technical statutory language, the sufficiency of the evidence to support a charge of aggravated or reckless manslaughter requires an inquiry into whether there is proof of accidental rather than intentional conduct. See State v. Powell, 84 N.J. 305, 316 n. 12, 419 A.2d 406 (1980), certif. denied, 87 N.J. 332, 434 A.2d 81 (1981); see also State v. Zola, 112 N.J. 384, 403, 548 A.2d 1022 (1988) (count properly charged jury on aggravated and reckless manslaughter), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989); State v. Rose, 112 N.J. 454, 482, 548 A.2d 1058 (1988). The decisions reflect this focus. Compare State v. Moore, 113 N.J. at 289-92, 550 A.2d 117 (reversing for failure to charge on lesser-included offenses of reckless and aggravated manslaughter where facts indicated that defendant had at one point attempted to revive the victim and where the cause of death was consistent with defendant's reckless conduct); State v. Bishop, 225 N.J. Super. 596, 605, 543 A.2d 105 (App.Div. 1988) (failure to instruct jury on manslaughter required reversal where the stabbing took place in the midst of an unruly brawl, with a large group of people fighting and shouting), appeal after remand, 247 N.J. Super. 382, 589 A.2d 625 (App.Div. 1991); State v. Washington, 223 N.J. Super. 367, 372-76, 538 A.2d 1256 (App.Div.), certif. denied, 111 N.J. 612, 546 A.2d 531 (1988) (court should have given reckless and aggravated manslaughter charges based on fact that defendant allegedly suffered an epileptic seizure at the time of the crime, rendering him unable to control his actions); with State v. Rose, 112 N.J. at 482-84, 548 A.2d 1058 (no basis for charging jury with aggravated manslaughter where the defendant fired a sawed-off shotgun into abdomen of another at point-blank range); State v. Crisantos, 102 N.J. at 278-81, 508 A.2d 167 (holding that there was no rational basis for a charge of aggravated or reckless manslaughter where the proofs established purposeful or knowing *331 conduct); State v. Mendez, 252 N.J. Super. at 160-62, 599 A.2d 565 (no rational basis for reckless manslaughter charge where the defendant fired a machine gun into a crowd of people); State v. Sanchez, 224 N.J. Super. 231, 239-42, 540 A.2d 201 (App.Div. 1988) (court properly declined to instruct jury on reckless and aggravated manslaughter where both defendants entered an apartment looking for someone and upon seeing someone else, shot that person, and fled the scene); State v. Micheliche, 220 N.J. Super. 532, 543, 533 A.2d 41 (App.Div.), certif. denied, 109 N.J. 40, 532 A.2d 1108 (1987) (no rational basis to charge lesser-included offenses of aggravated and reckless manslaughter because of defendant's intoxication and the "appalling severity of the victim's beating").
Applying these principles, we are satisfied that the evidence did not provide a rational basis for instructing the jury on aggravated or reckless manslaughter. We recognize that asphyxiation was one of the causes of death and that there was some evidence that the stabbing took place sometime thereafter. Having said this, the evidence provides scant support for defense counsel's assertion that the stab wounds were inflicted after death. On the contrary, the medical examiner testified that "the stab wounds of the neck and multiple throat slashings" resulted in "extreme blood loss" which constituted "a major contributing cause of [death]." We view it as sheer speculation, rather than an inference reasonably derived from the medical examiner's testimony, that the stab wounds may have been inflicted after death. Moreover, Jeffrey's eyewitness account of the killing clearly established that the gagging and stabbing of the decedent were essentially contemporaneous acts or, at the very least, related parts of a continuous course of conduct. Defense counsel's present attempt to dissect defendant's conduct into discrete, compartmentalized and independent acts is not supported by the evidence.

IV.
We find no merit in defendant's contention that his trial attorney failed to properly investigate Tucker's low intelligence *332 and the possibility of mental retardation. Defendant asserts that an adequate investigation would have revealed mental and emotional problems which would have a bearing on the voluntariness of his statements, the possibility of a diminished capacity or an insanity defense, and sentencing. During the pendency of this appeal, we remanded the matter to the Law Division so that this issue could be fully developed. Our examination of the transcript of that hearing convinces us that defendant was not denied the effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh'g denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); State v. Savage, 120 N.J. 594, 617-18, 577 A.2d 455 (1990); State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987).
Defendant's trial counsel had defendant examined by Dr. Gerald Cooke to determine (1) his competence, (2) the possibility of an insanity or diminished capacity defense, and (3) the voluntariness of his confession. Counsel was aware of the fact that Dr. Cooke had examined defendant previously when he was charged with killing his three year old son.[7] In any event, Dr. Cooke's examination in this case yielded findings which were detrimental to the defense in all respects. This information was conveyed orally to Mr. Rhoads. In one report, Dr. Cooke concluded that defendant possessed a "[p]ersonality [d]isorder" and fell into the "[d]ull-normal [r]ange of intellectual functioning, but that there was no evidence of psychosis" or incompetence. Mr. Rhoads did not require more explicit written findings because the doctor's conclusions had been orally conveyed to him. Mr. Rhoads consulted with a public defender attorney who agreed that he should "go no further" in pursuing these matters.
Based on this evidence, the trial court found that defendant's trial attorney had fairly and adequately explored the possibility of *333 raising a psychological defense. The court excluded defendant's proffer of an expert's opinion which deviated from Dr. Cooke's conclusions.
We perceive no sound basis to disturb the trial court's decision. On the record submitted to us, it is plain that no Sixth Amendment violation occurred. Counsel's performance was not in any way deficient.

V.
Finally, we find no reason to disturb the sentence imposed. R. 2:11-3(e)(2).
The judgment of conviction is affirmed in all respects.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The court's probable cause finding in issuing the search warrant for defendant's apartment arguably satisfied the requirement of Gerstein and Riverside. The point has not been raised or briefed, however, and we do not consider it further.
[3] The Michigan "arraignment" to which the court referred is equivalent to our initial appearance. See MCR 6.104(A), (E) (an arraignment on a complaint or warrant, where the arrested individual is advised of the charges against him and his right to an attorney at all subsequent court proceedings, must be provided without unnecessary delay). Jackson's argument to exclude confessions made after his arraignment was specifically predicated on M.C.L. § 764.26; M.S.A. § 28.885. See People v. Jackson, 114 Mich. App. 649, 655, 319 N.W.2d 613, 615 (1982). Under that statute, "[e]very person charged with a felony shall, without unnecessary delay after his arrest, be taken before a magistrate or other judicial officer and, after being informed as to his rights, shall be given an opportunity publicly to make any statement and answer any questions regarding the charge that he may desire to answer." See also People v. Mallory, 421 Mich. 229, 238, 365 N.W.2d 673, 677-78 (1984) (noting that M.C.L. § 764.26; M.S.A. § 28.885 requires that an arrested person be "brought promptly before a magistrate for the arraignment on a complaint and warrant" to advise him of "his constitutional rights and the nature of the charges against him...."), appeal after remand, 168 Mich. App. 255, 423 N.W.2d 637 (1988).
[4] Under Wisconsin law, the initial appearance is equivalent to our State's procedure, in that it must take place within a reasonable time after arrest, and inform the accused of the charges against him and his right to counsel. See WSA 970.01(1); Jones v. State, 37 Wis.2d 56, 67-69, 154 N.W.2d 278, 284-85 (1967), reh'g denied, 37 Wis.2d 56, 155 N.W.2d 571 (1968).
[5] As we noted earlier, the Court in Sanchez was concerned that the "perfunctory" recitation of the right to counsel and to remain silent may not, after the return of an indictment, provide the defendant with sufficient information to make a knowing and intelligent waiver of his constitutional rights. 129 N.J. at 276, 609 A.2d 400. The Court was referring to the recitation of warnings by a law enforcement officer in a custodial setting. Ibid. Whatever else may be said, there is nothing "perfunctory" about the conduct of an initial appearance. R. 3:4-2 requires the court to carefully explain the nature of the charges to the defendant and fully apprise him of his constitutional and procedural rights. Specifically, the rule provides:

At a defendant's first appearance before the court following the filing of a complaint, the judge thereof shall inform the defendant of the charge made against him and if a copy of the complaint has not previously been furnished to the defendant, shall furnish him with a copy thereof. The judge shall also inform the defendant of his right not to make a statement as to the charge against him and that any statement made by him may be used against him. In counties were a pretrial intervention program is approved by the Supreme Court for operation under R. 3:28, the judge shall also inform the defendant of the existence of such program, the name of the program director and the location at which application may be made for enrollment in such program. The judge shall also inform the defendant of his right to retain counsel or, if indigent and constitutionally or otherwise entitled by law to counsel, of his right to have counsel furnished without cost. If the defendant asserts he is indigent, unless he affirmatively and with understanding of his waiver of his right states his intention to proceed without counsel, the judge shall have him complete the appropriate form as prescribed by the Administrative Director of the Courts, if such form has not yet been completed. If the complaint charges the defendant with an indictable offense, the court shall refer him to the Office of the Public Defender. If the complaint charges the defendant with a nonindictable offense and the court is satisfied that he is indigent and that he is constitutionally or otherwise entitled by law to have counsel furnished, the court shall assign counsel to represent him in accordance with R. 3:27-2. The court shall allow the defendant a reasonable time and opportunity to consult counsel before proceeding further. If the complaint charges the defendant with an indictable offense, the court shall inform him of his right to have a hearing as to probable cause and of his right to indictment by the grand jury and trial by jury, and if the offense charged may be tried by the court upon waiver of indictment and trial by jury, the court shall so inform the defendant. All such waivers shall be in writing, signed by the defendant, and shall be filed and entered on the docket. If the complaint charges an indictable offense which cannot be tried by the court on waiver, it shall not ask for or accept a plea to the offense. The court shall admit the defendant to bail as provided in R. 3:26 and R. 7:5.
[6] Defendant has apparently abandoned his contention that the homicide was committed in the heat of passion resulting from reasonable provocation.
[7] Defendant later pleaded guilty to manslaughter and was sentenced to ten years.