**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4871-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN R. JORDAN,

    Defendant-Appellant.

_____

Submitted November 5, 2020 – Decided January 28, 2021

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 15-04-0465.

Joseph E. Krakora, Public Defender, attorney for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Jaimee Chasmer, Assistant Prosecutor, of counsel and on the brief; John J. Scaliti, Legal Assistant, on the brief).

PER CURIAM

Tried by a jury, defendant John Jordan was convicted of the murder of his wife, Tracey.  See N.J.S.A. 2C:11-3(a)(1) and (2).[1]  The trial judge sentenced defendant to life subject to the No Early Release Act's eighty-five percent parole disqualifier.  See N.J.S.A. 2C:43-7.2.  He appeals, and we affirm.

On the morning of May 9, 2014, defendant entered his wife's apartment, where she lived with the parties' two sons.  It is unclear how he gained access, either because she admitted him, or he let himself in with a key she had given him.  The parties, who were married in 2001, had been separated for nearly two years.

Using both hands, defendant choked Tracey until she lost consciousness.  While she lay immobile on the bed she shared with their sons, he stabbed her sixteen times with a seven-inch knife, taken from her kitchen, in the area of her heart.  The medical examiner, in addition to describing the manner of death, testified that Tracey's body bore no defensive wounds.

One of the officers who conducted the welfare check on Tracey said she was on her back, her hands along her sides, her head surrounded with the children's stuffed toys on the pillows.  The bedroom was neat and orderly, as

---

[1]  The jury acquitted defendant on two counts of first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1).

A-4871-17T1

was the rest of the small apartment, showing no signs of a struggle.  The blinds were pulled shut.

The welfare check was initiated by Tracey's family, concerned that she was not answering her cell phone, and that defendant had taken the children that morning from school, claiming they had a dental appointment.  Tracey's sister Debra texted defendant at approximately 3:18 p.m. that afternoon when her mother attempted to pick the children up from school and was told they had already left.  Tracey had never previously forgotten arrangements for a family member to assist with child care.  Defendant told Debra that Tracey was having trouble with her cell phone and that the children had told him they would be going out that night with their mother.  When Tracey's mother drove to the apartment and saw that the shades were pulled shut, she called police.

Sometime between May 9 and May 10, 2014, Debra received a three-page single-spaced letter the State moved into evidence at trial.  In the letter, defendant described Tracey as a faithless wife and poor mother.  Among her weaknesses as a parent, defendant complained that she was not giving the children the vitamins that he had bought them.

When defendant testified during the trial, he claimed he mailed the letter after the murder as he drove with the children towards his father's home in South

3

Carolina. A GPS found in Tracey's car, which defendant appropriated to make the trip, indicated that the day before the killing he had been in the vicinity of the Lodi post office. On the stand, he denied mailing the letter before the murder, insisting that during his trip he pulled over to a mailbox near a farmer's field.

Defendant was arrested at approximately 1:00 a.m. as he and the children approached his father's home. When interviewed, he explained to the Bergen County Prosecutor's Office detectives that his wife had been unfaithful, and a poor mother, and mentioned the letter he had written to Debra. He admitted killing Tracey and washing his hands afterwards but did not mention any confrontation, physical or otherwise, between him and the victim.

During the trial, the state moved into evidence text messages extracted from defendant's cell phone from himself to himself as follows:

6:25 a.m. – Defendant's text to himself

> Mom, listen to me very, very carefully. Tracey is gone. Suffice it to say she has pulled more crap with me and subjected Nicky and Anthony to way too much. They would've grown up to be two more self-centered manipulative horrible people. Just like Gloria. Just like Tracey. The boys are at [dad's] now or if I didn't make it there with them, they're in custody somewhere between NJ and SC. I want the boys to be with you and Mike or dad and Beth. They said [they] want to live with you most. Not Gloria, they hate even seeing her.

A-4871-17T1

I don't want them around anyone else. Please please please promise me you will take them and do the same incredible job raising them that you did with Mike and I. Please fight for custody. I doubt anyone will contest it. Mike can get the money back [from the] bankruptcy lawyer. We didn't complete the process yet. My car is parked on Avenue A in Lodi. I had to use the money you sent me for gas to get to [dad's]. I'm sorry. There is easily five to eight thousand dollars worth of stuff if not more in that storage place. Pictures, cookware, stereo equipment, a lifetime's worth of great clothes, leather jackets, suits. Don't let it go to auction. You could easily sell all that stuff. It's worth the airfare to do it. (Bob's storage in Lodi unit number 39. Dad has the key to my car and storage.) I love you mom and part of me still wishes I came out there.

I read a quote that said, "Without enough love or hope we start losing strength to live." Tracey made me believe there was hope. She had used me for so long, right up to the end, lying to me. The reality is she is so damaged that it began to rub off on the boys. I was in a position to not let that happen when you [came] out here but screwed that up. Now I have fallen so far… I'm not on drugs, I'm not addicted to anything at all. My mistake was believing in Tracey. When I found out the truth it was so much worse than I ever expected. There were more guys than just Ralph and she lied to them all. She would've ruined the boys. I already started seeing signs of it in Nicky… that poor little angel. On top of the psychological damage she screamed at them, cursed at them, no breakfast, not brushing their teeth, not giving them their vitamins I brought over.

Anthony started missing too much school because he got sick. Nicky started failing tests regularly because she wouldn't study with him. The constant yelling from her. They started to scream at

5

A-4871-17T1

each other. She would leave them with a stranger overnight so she could sleep around. Anthony told me he was scared. Nicky started to lie to me and make up stories. It was bad. Please please please rescue them from the crap. They've lived through too much of it already.

Extracted from the victim's phone were exchanges with defendant in which Tracey asked him to meet her at the boys' school with $2 towards money the boys needed that day. Defendant deleted the messages he exchanged with the victim from his own phone. At the time, defendant was unemployed and lived in his car.

Defendant regularly used a computer at the Lodi public library, copying material he wished to save to a flash drive. From the flash drive, a Prosecutor's Office detective located three items admitted into evidence, including a checklist entitled "This is the end," containing information about traveling to South Carolina. The information included an approximation of travel hours, the amount of gas that would be required, the phrase "Leave at 12? Be there at midnight." The entry continued, "5.5 hours to bridge. [$40] gas. Leave at ?" Defendant created a "To Do" list which stated "Pack clothes, call for address for bridge to put in GPS. Write letters to mom, dad, Deb." Defendant composed a note to his sister-in-law: "Deb. You once told me that 'Tracey will put me in an early grave.['] You were right."

Defendant also composed a note to his children. A draft of the letter defendant mailed to Debra, included in the flash drive, ended with defendant writing that "Tracey is gone."

Defendant testified he went to the apartment that morning to speak to the victim because she had asked for money; they argued. He wanted to have a serious discussion about their marriage, but Tracey would not get off her cell phone. Defendant said she physically attacked him, kicking him in the groin, threatening him that he would never see his children again.

Defendant denied any of his writings demonstrated an intent to commit murder—he characterized them as a means for him to cope with the intense feelings his marital situation engendered. He explained the reason he did not tell the officers about the victim's attack, or her kick or knee to the groin, or her threat to keep the children from him, was an oversight attributable to his emotional state when interviewed.

The trial judge conducted a Rule 104 hearing regarding the admissibility of defendant's proposed expert testimony. Pertinent to this appeal, the expert testified that "journaling" was defendant's coping mechanism, not the expression of a plan. The term was used to include defendant's texts to himself and his letters. The issue relating to the journaling, defendant argued, was key to refute

the State's position that his writings established intent to kill. The expert opined, contrary to the State's psychologist, that defendant was the victim of a domestic violence-type emotional abuse relationship. Her testimony was intended to bolster his defense of passion/provocation. See N.J.S.A. 2C:11-4(b)(2). Defendant's attorney contended the testimony would serve dual purposes: to establish the passion/provocation defense and to rebut the State's claim that defendant planned the murder.

The court denied defendant's application because the expert could not offer an opinion regarding defendant's writings without potentially confusing or misleading the jury, particularly as it related to a subject not outside the ken of the average juror. Defendant would be permitted to explain, however, the purpose of his letters and texts—that they were not planning tools but an opportunity for him to express himself, and that the letter to Debra was not mailed until after the killing.

The court charged passion/provocation but refused defendant's request to instruct the jury as to aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). He said defendant's conduct was clearly intentional, engaged in with the knowledge that death was the only possible result. The judge relied on the medical examiner's testimony in making the decision. We detail the judge's findings regarding

8

mitigating and aggravating factors in the section dealing with defendant's sentence.

Defendant now raises the following points on appeal:

POINT I
THE EXCLUSION OF EXPERT TESTIMONY REBUTTING THE STATE'S INTERPRETATION OF DEFENDANT'S WRITINGS, VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE.

POINT II
THE EXCLUSION OF A CHARGE ON THE LESSER-INCLUDED OFFENSE OF AGGRAVATED MANSLAUGHTER WAS REVERSIBLE ERROR.

POINT III
THE PROSECUTOR COMMITTED MISCONDUCT WHEN HE SAID DEFENDANT LIED ABOUT THE FACTS OF THE OFFENSE, AND WHEN HE ACCUSED DEFENDANT OF LYING ABOUT WHEN HE MAILED A LETTER AT ISSUE, AND WHEN HE SUGGESTED THAT HE HAD EVIDENCE OUTSIDE THE RECORD ABOUT THE POSTMARK ON THE LETTER. (Not Raised [at Trial])

POINT IV
THE IMPOSITION OF A LIFE TERM ON THIS 51-YEAR-OLD DEFENDANT WITH AN UNBLEMISHED RECORD IS NOT SUPPORTED BY THE RELEVANT SENTENCING FACTORS AND IS GROSSLY EXCESSIVE.

Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. It must have probative value and materiality. State v. Buckley, 216 N.J. 249, 261 (2013). Evidence need not be dispositive or strongly probative, but only tend to prove the proposition. Ibid. Relevant evidence is admissible unless another rule or law excludes it. N.J.R.E. 402. As the trial court excluded the expert testimony on the basis of N.J.R.E. 401 and 403, those are the relevant considerations.

All relevant evidence is subject to the constraints of N.J.R.E. 403. N.J.R.E. 403 permits exclusion of the evidence if the "probative value is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury[.]" Consequentially, if the expert testimony carries an N.J.R.E. 403 risk that substantially outweighs its probative value, it may be omitted at the court's discretion. State v. Reeds, 197 N.J. 280, 295 (2009).

The judge's exercise of discretion was reasonable. The expert's testimony and opinion were based on interviews and evaluation of defendant. Other than defendant's statements, there was no indicia that Tracey emotionally abused him.

There was no corroboration, scientific standard testing, or any objective proof that lifted the opinion above a net opinion. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) (stating that the net opinion rule prevents the admission of expert testimony "lack[ing] an appropriate factual foundation and fail[ing] to establish the existence of any standard about which the expert testified.").

Although not entirely clear on appeal, as it was not entirely clear before the trial judge, defendant seemed to be proffering the witness not so much to support the passion/provocation defense, but to refute any claim that his writings were an expression of his intent to kill his wife. Defendant argued before the judge, as he does now on appeal, that writing things down is, for some, a "substitute for action."

But an expert should not express an opinion on matters that fall within the ken of the average juror, see State v. Torres, 183 N.J. 554, 568 (2005), nor should they opine about a defendant's guilt, see State v. Trinidad, 241 N.J. 425, 444 (2020). We agree with the trial judge that the average juror could indeed conclude that writing things down—in cell phone texts or emails or letters—was defendant's way of coping with strong emotions for which there was no other outlet. There is no question that defendant said so from the stand, and the State

11

did not object to him doing so. There was no basis, however, for admission of the psychologist's testimony that this was merely an adaptive mechanism. It is an opinion on a subject readily within the ken of the average juror. It had the potential to usurp the jury's obligation to determine whether defendant's writings were an expression of his intent or plan to kill his wife or merely expressions of his strong emotions.

Just as a police officer is not permitted to opine that a series of observations mean a drug transaction has taken place, because that is the ultimate factual question left for the jury, this psychologist was properly excluded from opining that defendant's writings were not his planning documents, but merely an expression of strong feelings. See State v. Sowell, 213 N.J. 89, 102 ("It is not appropriate to summarize straightforward but disputed evidence in the form of a hypothetical and then elicit expert opinion about what happened. That approach . . . can usurp the jury's sole responsibility to find the facts."). And her testimony was unnecessary, given his, to proffer that they only provided an emotional safety valve.

Similarly, defendant's position that his wife was emotionally abusive towards him, which would have been bolstered by the psychologist, was one he was permitted to make in the absence of expert testimony. Defendant was not

raising the claim of diminished capacity, battered spouse syndrome, or any other actual legal defense. He instead suggested that he was a battered spouse because of Tracey's emotional control, which if corroborated by an expert, had the potential to mislead the jury.

Defendant clearly wished to introduce the psychologist's testimony to refute the reading of the letters and texts as expressions of a plan as opposed to expressions of feelings. On that score, an "expert" opinion was inappropriate as a net opinion and not necessary because defendant testified as to their purpose. The jury was free to decide if it believed the writings established premeditation—or not, based solely on his testimony. We therefore find no error in the judge's exercise of discretion in barring the evidence pursuant to N.J.R.E. 403.

II.

Challenges to jury instructions raise issues of law reviewed de novo. State v. O'Carroll, 385 N.J. Super. 211, 225 (2006). Appellate courts apply "the rational-basis test . . . to review the trial court's failure to provide a jury instruction when defendant requested it." State v. Carrero, 229 N.J. 118, 127-28 (2017).

A jury instruction defining a lesser-included offense should be given if there is a rational basis on which the jury can convict. N.J.S.A. 2C:1-8(e); State v. Fowler, 239 N.J. 171, 187 (2019). A rational basis exists where "evidence [presents] adequate reason for the jury to acquit the defendant on the greater charge and to convict on the lesser." State v. Brent, 137 N.J. 107, 119 (1994). "However, sheer speculation does not constitute a rational basis." Id. at 118.

Establishing a rational basis requires a court to "view the evidence in the light most favorable to the defendant." Carrero, 229 N.J. at 128. "A defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory." Ibid. It is reversible error not to charge a proper lesser included offense. State v. Tucker, 265 N.J. Super. 296, 329 (1993).

N.J.S.A. 2C:11-4(a)(1) defines aggravated manslaughter as "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life." There are two categories of manslaughter. N.J.S.A. 2C:11-4(b). The first is reckless manslaughter that occurs when a homicide is "committed recklessly." N.J.S.A. 2C:11-4(b)(1). The second is passion/provocation manslaughter, or "[a] homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3 . . .

committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2).

Passion/provocation manslaughter assumes a defendant's intent to kill the victim. State v. Robinson, 136 N.J. 476, 486 (1994). A defendant who commits aggravated or reckless manslaughter did not intend to kill, but acted with recklessness. State v. O'Neil, 219 N.J. 598, 612 (2014).

Defendant argued that there was a rational basis for the jury to find that while acting recklessly, he accidentally killed the victim while strangling her, inflicting stab wounds postmortem. The facts here parallel those in State v. Tucker, in which the failure to charge the jury with aggravated manslaughter was not error. 265 N.J. Super. 296 (1993).

In Tucker, the defendant asphyxiated and stabbed the victim. There was evidence that, while both were a cause of death, the stabbing took place after the asphyxiation. Id. at 331. The notion that the stab wounds, which the defendant contended were the only intentional conduct, were inflicted after death, was mere speculation. Id. at 331. The evidence demonstrated the acts were "essentially contemporaneous or, at the very least, related parts of a continuous course of conduct." Ibid.

Defendant's argument is almost identical to the one rejected in <u>Tucker</u>.[2] Defendant's testimony at trial described the events as follows:

> I grabbed her right around the throat with both my hands and we fell back on the bed. And I don't remember anything. I don't remember. The next thing I remember I'm standing above her with this kitchen knife in my hands and I'm looking at her. I said what the [f**k]. I dropped the knife.

The medical examiner's testimony, however, clearly contradicts defendant's contention. Defendant first choked the victim to the point of unconsciousness, then stabbed her while she was still alive. The absence of defensive wounds or signs of a struggle also refute his claim that the two wrestled before they fell onto the bed and that he remembered nothing after choking her. Defendant speculates that the jury could have found his conduct was a choking, followed by stabbing post-mortem. Such a verdict would not have conformed to the proofs.

The ferocity with which defendant stabbed the victim, and the fact the stab wounds were all located around the heart area make this an intentional killing. The record did not support the proposition that defendant was acting recklessly,

---

[2]  Defendant argues that in <u>Tucker</u> there was no medical examiner evidence supporting the defendant's theory, but that is an incorrect reading of the case. <u>See</u> <u>Tucker</u>, 265 N.J. Super. at 331 ("We recognize that asphyxiation was one of the causes of death and that there was some evidence that the stabbing took place sometime thereafter.").

that he accidentally killed Tracey while strangling her, inflicting the stab wounds post-mortem. The medical examiner's testimony was uncontradicted. When the stab wounds were inflicted, the victim was alive. Thus, the court did not err in refusing to give the aggravated manslaughter charge. Such an instruction was not supported by the evidence.

## III.

Defendant made no objection to the prosecutor's comments in closing. Nonetheless, there can be no doubt that the prosecutor crossed a line in characterizing defendant's testimony as lies.

Prosecutorial misconduct warrants reversal only if the misconduct was clear and unmistakable and it "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 575 (1999). When determining whether prosecutorial misconduct denied the defendant a fair trial, we look to "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." State v. Daniels, 182 N.J. 80, 96-97 (2004) (quoting State v. Smith, 167 N.J. 158, 182 (2001)).

17

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial."  State v. Frost, 158 N.J. 76, 83 (1999).  The level of prejudice is determined by "consider[ing] the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred."  Timmendequas, 161 N.J. at 575.

A prosecutor may not express their personal opinion about the defendant's truthfulness.  State v. Marshall, 123 N.J. 1, 156 (1991).  This conduct is improper because it might lead the jury to adopt the prosecutor's opinion without independent deliberation, and in reliance upon the suspicion the opinion is based on evidence not entered at trial.  State v. Jenkins, 299 N.J. Super. 61, 70 (1997).

If a prosecutor expresses an opinion on a defendant's truthfulness, the prejudice is not harmless if the opinion was expressed repetitively.  Id. at 71. Even if expressed only once, if there is no evidence to support the assertion that the defendant lied, it may be found to be prejudicial.  State v. Rivera, 437 N.J. Super. 434, 463 (2014); see also Daniels, 182 N.J. at 98 (holding general accusations, "despite no specific evidentiary basis[,]" of testimony tailoring based on trial proceedings are improper); State v. Blakney, 189 N.J. 88, 97 (2006) (holding "inadequate jury instructions combined with the prosecutorial

A-4871-17T1

excesses in summation, when cast against the less than overwhelming evidence supporting a murder conviction, cannot be viewed as harmless.").

A prosecutor may not call the defendant a "liar" or employ any derogatory epithets against the defendant. State v. Pennington, 119 N.J. 547, 577 (1990). "[D]erogatory name-calling will not be condoned." State v. Williams, 113 N.J. 393, 456 (1988). Over the course of the prosecutor's summation, the prosecutor said on seven occasions that defendant lied, used the word "lied," "lie," or "lies" in reference to defendant nineteen times, and called defendant a "liar":

> He closed those blinds. Deception, lies, one after the other. Proof of plan and purpose equals murder . . . .
>
> . . . .
>
> This was an ambush. She had no way out. No way out. And at the minimum of the lies he tells the only half truth we get is that he does admit he strangled her with both hands . . . .
>
> . . . .
>
> The other thing we know is that there were lies to Debbie. Very, very many lies to Debbie. We know that at 3:18 the text messages with Debbie begin. She tried calling him but he didn't pick up the phone. So she texted him. I guess it's easier to lie over text than by voice "Everyone's really worried so please call me or in fifteen minutes we're calling the cops."
>
> Now what does he do after that? He texts lie after lie after lie. Dropped them off to the dentist. Who

19

knows, maybe they're seeing a movie. Her phone died when she was texting me. Say they had plans with mommy to see a movie on Friday night, going out.

And the pieces de resistance, she's probably having the kids lie to me, knowing full well he's the <u>liar</u>, he's the one with the kids in that car and he's the one who just killed her and left her in the bed that she shares with them. . . . <u>Lie, after lie, after lie</u>.

. . . .

He <u>lied</u> and we're going to get to how he <u>lied</u> up there soon, but he <u>lied</u> to Debbie over and over and over again, knowing full well Tracey was indeed gone . . . .

. . . .

Again maybe one thing he doesn't <u>lie</u> about. He certainly puts a lot of thought into everything he does

. . . .

This whole story, this <u>lie</u> about being kneed in the groin, about Tracey threatening to take the kids, come on. The evidence doesn't show that. The evidence doesn't show struggle. The evidence shows ambush. The evidence shows no defensive wounds. The evidence shows that Tracey was helpless and she was never going to be able to fight back. The evidence shows he planned this down to a "T" . . . .

. . . .

We talked about the school, and how he <u>lied</u> about where he was taking them. We talked about the <u>lies</u> to Debbie that impinged upon the investigation. We talked about the text . . . .

[(emphasis added).]

Defendant's credibility was a key issue on the question of the classification of the homicide. The dispute was not whether he killed his wife, but whether he did so purposefully or knowingly, or whether the conduct could be mitigated to manslaughter committed under reasonable provocation. The prosecutor's characterizations were improper, even if woven into his recitation of the facts developed at trial.

We conclude, however, that the comments did not affect the outcome. The letters and text messages defendant sent to himself and family detailed his intent and plan. If the communications had been mere expressions of his emotional interior life, they would not have been drafted and redrafted so as to lay the blame for the situation on the victim's head. Ordinary journaling does not include sending those entries to others—presumably they are kept private to the author. The victim had no defensive wounds, and the murder scene was neat and orderly. There were no signs of any struggle.

These well-established circumstances contradicted defendant's testimony that Tracey attacked him physically, kicked him in the groin, and then threatened he would never see the children again. In addition, the jury was presented with the disparity between defendant's statements to police and his trial testimony.

There was overwhelming support in the record for the position that defendant was not being truthful. The improper comments thus cannot be characterized as having been so prejudicial as to require that we set aside the verdict.

IV.

Defendant has no prior criminal history. In sentencing defendant, the judge correctly merged third-degree possession of a weapon for unlawful purpose, a knife, N.J.S.A. 2C:39-4(d), and fourth-degree unlawful possession of a weapon, a knife, N.J.S.A. 2C:39-5(d), into the murder count. He found aggravating factors one, two, three, and nine, and in mitigation, only factor seven. See N.J.S.A. 2C:44-1(a)(1), (2), (3), and (9) and N.J.S.A. 2C:44-1(b)(7). The minimum sentence for murder is thirty years. N.J.S.A. 2C:11-3(b)(1).

The judge concluded that the cold-blooded nature of the killing, defendant's detailed planning and execution, and his explanation for his conduct, at odds with the scene, demonstrated defendant was at risk to commit further criminal acts. We agree.

The court's rejection of mitigating factors eight and nine were supported by the record. Defendant's response to his wife's purported disloyalty occurred after the parties had been separated for a significant amount of time. The record supports the court's determination that defendant was at risk of reoffense, as

defendant chose to kill his wife as opposed to resolving the parties' disputes within the safe structure of the family court.

The judge anchored aggravating factor one to the impact defendant's conduct would have on the children. See State v. Lawless, 214 N.J. 594, 609-10 (2013) (noting that factor one is measured by the "impact on . . . the overall circumstances surrounding the criminal event" to determine the "gravity of defendant's conduct."). Furthermore, defendant's manner of killing his wife does appear to be particularly heinous in that first he rendered her unconscious by choking her, then stabbed her.

The disparity in size between the victim and defendant contributed to aggravating factor two. She was not only slight of build, while at the time of the murder defendant weighed between 200 and 220 pounds, but by first choking her, defendant made her incapable of physical resistance, thus implicating aggravating factor two.

Defendant is at risk of reoffense. He provided an unconvincing rationale for the killing, his response to her alleged unfaithfulness during the marriage, while failing to hold himself accountable.

The court found aggravating factor nine and gave it great weight. There are many whose family disputes can be resolved without violence through the courts—and it is important to deter them.

Trial judges have broad discretion over sentencing so long as they appropriately identify aggravating and mitigating factors, express the competent credible evidence upon which they rely, and properly balance the factors. See State v. Case, 220 N.J. 49, 65 (2014). The sentence the judge imposed was a reasoned exercise of discretion, well within the bounds of the statutory scheme.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4871-17T1